522 So.2d 152 (1988)
Earl H. HINES, Jr. & Beverly Helms Hines, Plaintiffs-Appellants,
v.
REMINGTON ARMS COMPANY, INC. & Sinclair, Inc., Defendants-Appellees.
No. 86-1140.
Court of Appeal of Louisiana, Third Circuit.
March 8, 1988.
Rehearing Denied April 11, 1988.
Writ Denied May 13, 1988.
*153 Jones, Jones & Alexander, J.B. Jones, Cameron, for plaintiffs-appellants.
Raggio, Cappel, Chozen & Berniard, Thomas L. Raggio, Scofield, Bergstedt, Gerard, Mount & Veron, P.C., John B. Scofield, Lake Charles, Stockwell, Sievert, Viccellio, Clements & Shaddock, John S. Bradford and Thomas G. Henning, Lake Charles, for defendants-appellees.
*154 Before FORET, DOUCET, YELVERTON, KNOLL and CULPEPPER[*], JJ.
FORET, Judge.
This is a suit by Earl H. Hines, Jr. and Beverly Helms Hines against Remington Arms Company, Inc., et al as a result of an accident which occurred on February 29, 1984. The only issue on this appeal is whether the summary judgment rendered by the trial court dismissing plaintiffs' suit against Remington Arms Company is proper.
The trial court judge has favored us with excellent reasons for judgment, and we take the liberty of adopting his reasons as our own, with minor editorial changes and some supplementation, which will be obvious.
"Mr. Hines purchased a specifically constructed.22 rifle from one Fred Sinclair of New Haven, Indiana, about two years prior to the incident. It was to and did serve one purpose only: that of a bench rest target rifle for competitive shooting. Thereafter Mr. Hines contacted Sinclair by telephone and requested that he make another rifle exactly the same as the first one. This was eventually accomplished. The gun was sent by Sinclair to a Lake Charles gun dealer and picked up by Hines on the day of the accident.
"The undisputed facts show that Sinclair is a gunsmith who makes or alters rifles only for target shooting. He is not a dealer or agent for Remington Arms but is allowed some discount in price because of the volume of parts he purchases. Both of the guns he manufactured for Mr. Hines originated with Remington.
"Sinclair purchased a Model 700 twenty-two caliber repeating rifle from Remington, without a stock. He then removed and discarded the barrel, leaving only the bolt and frame of the original gun. He manufactured a new barrel and then reamed, or honed, out the receiving chamber so the gun would accommodate cartridges with a larger diameter but tapered down to the size of the .22 bullet. He removed the extractors on the rifle bolt and replaced them with others which would accommodate the larger bodied cartridge.
"The Model 700 Rifle as manufactured by Remington has a safety which blocks the trigger from any movement, when engaged. The trigger has a four pound pull strength. For conversion into a target rifle, Sinclair removed and discarded the trigger assembly and replaced it with a Burns conversion assembly. That is a product made by another gunsmith in Arizona. He uses a Remington trigger mechanism, removes the safety and adds other parts to the mechanism so the leverage of trigger pull is multiplied. This permits adjustments to be made so the trigger then functions with a two ounce pull strength. The completed gun then has no safety of any sort.
"A specially made stock was then fitted to the newly created rifle, appropriate for bench rest target shooting but completely inappropriate for hunting or free-handed shooting. The completed guns were not repeating rifles but were single shot, to be loaded by hand. They were intended to be loaded when the shooter was seated at the table at a rifle range, with the gun pointed down-range.
"During one telephone conference between Hines and Sinclair during the making, or conversion, of the second rifle, Sinclair told Hines that he was still using the same reamer to enlarge the gun chamber as had been used on the first gun. He did not believe it was worn, but instructed Hines to test it upon receipt to determine that it accepted his cartridges snugly to assure accuracy in shooting. If not, Sinclair would rebuild it.
"Hines reloads his cartridges in a room in his home. During the course of time he has been target shooting he has selected certain ones that seem to better contribute to accuracy. He replaces the primer, gunpowder *155 and bullets in them and seems to prize them.
"Upon returning home after taking delivery of the second rifle, Hines went into his loading room, selected one of his prized cartridges, already reloaded, and placed it in the gun breech, with the bolt drawn to the rear. When he shoved the bolt forward to push the cartridge into the receiving chamber the cartridge fired when the bolt closed. The bullet entered a canister of gunpowder that was at the back of the loading table. A terrific explosion and fire resulted in Hines' injuries.
"Remington Arms Company brings this motion for summary judgment on the basis that the gun which caused Hines' damages, which likely was defective as manufactured by Sinclair, is not a Remington Model 700 Repeating Rifle; that it only contains few of the parts manufactured by Remington and at the time of the incident was not being used in the manner for which it was designed.
"The Remington 700 Rifle is designed to use rim-fire cartridges which are approximately the same diameter as the bullet in them. It has a safety which blocks the trigger from movement, when engaged.
"The Sinclair rifle is designed to use larger cartridges and has no safety.
"Remington had no control over Sinclair and the manner in which he used some of their components to build a gun totally dissimilar to the Remington Model 700 Rifle.
"Plaintiff urges in opposition to this motion that the accident may not have happened if the Remington 700 Rifle as manufactured by that company had been designed and equipped with a firing-pin safety rather than a trigger safety. He urges that it would have been unnecessary then for the safety to be removed in converting the trigger mechanism and it is unlikely that a firing-pin safety would have been removed. He demonstrates that there are other rifles on the market with firing-pin safeties and strenuously urges that the Model 700 has a design defect for not having one.
"That argument, however logical it may or may not be, does not address the legal issue of a design defect. In order for a user to recover under the design defect theory, he must demonstrate that the object was defective, unreasonably dangerous to normal use and that his injuries or damages were caused by the defect. (See: Weber v. Fidelity and Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 [La.1971]; Landry v. E.A. Caldwell, Inc., 280 So.2d 231, La.App. 1st Cir.1973.)
"Plaintiff and intervenor have filed affidavits by their experts which, among other things, attempt to interpret the testimony of others and to reach legal conclusions therefrom. Such is not the duty or proper function of expert witnesses. However, they concluded that the Remington Model 700 .22 Rifle is dangerously defective in design and manufacture because it is equipped with a trigger safety and not with a firing-pin safety. They testify that there would have been no need for Sinclair to remove the suggested safety in order to modify the trigger mechanism. That is, of course, intended to present a factual issue to preclude the requested summary judgment by Remington. It does not counter or oppose the undisputed facts demonstrated in the depositions filed in support of Remington's motion, nor does it present a factual dispute insofar as the manufacturer's responsibility imposed by the laws of this state.
"A manufacturer has no duty to make a product that is foolproof. (Tri-State Ins. Co. of Tulsa, Oklahoma v. Fidelity & Casualty Co. of N.Y., N.Y., 364 So.2d 657, La.App. 2nd Cir.1978. Writs refused.) [365 So.2d 248 (La.1978)]
"No factual dispute is presented as to the manufacturing alterations performed by Sinclair. Remington's evidence shows that ample warnings accompanied the original rifle when it was shipped to Sinclair. These specifically cautioned against any alterations in the adjustments of the trigger mechanism, which Sinclair removed entirely, and directed that the gun be returned to Remington for any such adjustments desired.
*156 "Products liability law imposes responsibility upon the manufacturer for defects in the normal and intended use of the product. In this instance the portions of the original rifle that remained in the finished product sold by Sinclair bear little relationship to the gun manufactured by Remington, and it is for a specialized heavy-duty use much greater than the original repeating .22 rifle. The intended use of this gun could in no manner be considered normal to the use intended for the original gun.
"The fact issue presented by opponents to this motion can at most lead only to speculation that perhaps a firing-pin safety would not have been removed by Sinclair; that perhaps Hines would in fact have engaged such a safety before closing the bolt on the rifle and that perhaps he would have ordered a gun made differently. Those are not the issues raised by this motion and by the manufacturer's duty under the law.
"As stated previously, Hines was quite experienced in target competition. He already owned a gun exactly like this one and in fact ordered that his first gun be duplicated. He knew there was no safety device on these guns after Sinclair's rebuilding of them. He had no reason to believe the second gun had a safety. He was, in fact, what the courts have described as a sophisticated user who already knew or should have known of the dangers involved in handling a loaded target rifle with no safety device. Remington was under no duty to warn him of a danger with which he was already familiar. (See: Ducote v. Liberty Mutual Ins. Co., 451 So.2d 1211, La.App. 4th Cir.1984 and Byrd v. Hunt Tool Shipyards, Inc., 650 Fed.2d 44, 5th Cir.1981.)
"The sophistication of Hines in the use of the identical rifle is not controverted herein. His deposition demonstrates that almost every day, prior to this accident, he went to the target range and practice fired his rifle about 100 times. Obviously, in the approximately two years he owned the first rifle, he had fired it several thousand times, without a safety device and without mishap.
"The basic fact upon which this motion is founded is that Mr. Hines ordered a safety removed from a gun he wished to purchase. He now attempts to impose liability upon the original manufacturer of some of the components used in the remanufacturing of the kind of gun he wanted, urging a failure to provide a foolproof, unremovable safety. No such duty is imposed upon Remington under these circumstances under LSA-C.C. Articles 2315, 2316 and 2545 under the interpretations by the courts in the cases cited herein, Supra."
In summarizing, it is undisputed:
1) that plaintiff knew exactly what model rifle he wanted, he ordered it, and he received it;
2) that plaintiff knew that the rifle would not have a safety of any kind after customizing by Sinclair;
3) that plaintiff had fired thousands of rounds with his first such rifle without incident, a fact which belies the speculations by plaintiff's "experts" that the Remington 700 had a tendency to downfire;
4) that plaintiff knew of the extremely light trigger pull ... this is what he wanted and what all target shooters want in a competition target rifle;
5) that bench-type rifles have no safety because none is needed in its intended normal use;
6) that bench-type target rifles are suitable for no other purpose;
7) that these rifles are normally loaded only when in place, ready for fire, on the bench pointing toward the targetno safety needed here because no risk of injury to anything but the target;
8) but even so, this rifle did have a safety in place when it left Remington;
9) that plaintiff was a sophisticated user;
10) that plaintiff could have used an empty cartridge casing to test the fit of his reloaded and reshaped bullet casings to the new rifle's breech;
11) that after receiving the rifle from Remington, Sinclair did at least the following:
a. changed the barrel completely;

*157 b. installed a completely different stock;
c. removed the safety;
d. installed a completely different trigger mechanism;
e. modified the bolt and bolt stops;
f. modified the loading ramps;
g. changed the caliber;
h. modified the extractor to fit larger cartridges.
12) that these Remington rifles are tested at the factory before being shipped out.
13) that the standard trigger pull is four pounds;
14) that Sinclair uses a Burns trigger assembly (no way connected with Remington) which has a two ounce or less trigger pull;
15) that the only component parts left in the Remington rifle that came from the factory were the bolt which had been altered by Sinclair as mentioned in No. 11 above, and the frame and the screws holding it together.
To counter the above related undisputed facts, plaintiff introduces the opinions of two "expert" witnesses to say that the Remington rifle had a design defect in that if a firing pin safety had been used, as is used in the Winchester 70 rifle, instead of the trigger safety used by Remington, that this accident would not have occurred, and that therefore a genuine dispute of fact exists. Our review of the affidavits, etc. of these expert witnesses does not reveal that the statements made were based on personal knowledge, or that if the Remington rifle downfired, under what circumstances, or that Remington was the only company using the trigger safety, or that Winchester 70 rifles are ever used in competition target shooting. Neither one enumerated any specific incidents, or frequency or percentages of downfiring. Simply put, we agree with the trial judge that the opinions of plaintiff's "expert" witnesses were based on conclusions from what others had said, and appear to be no more than legal conclusions.
Our summary judgment procedure is designed specifically to accomplish exactly what the trial judge did in this case, i.e., to bring the matter to a head prior to an expensive and protracted trial, and put an end to litigation in which a party, in this case the plaintiff, has no chance of prevailing at trial. Our review of the record and of the undisputed facts shown in support of the motion for summary judgment convinces us that no disputed issue of material fact exists from which a rational fact finder could decide in favor of the plaintiff. And, we believe that this is so even if there were, arguendo, a design defect in the Remington 700 rifle. What the plaintiff bought had no resemblance whatsoever to the Remington 700 rifle that one sees in a sporting goods store. As a matter of fact, the rifle in question was much more drastically altered and modified than was the Mossberg shotgun involved in Allien v. Humphries Motors, Inc., 509 So.2d 499 (La.App. 3 Cir.1987), writ denied, 510 So.2d 376 (La.1987). At least in Allien, the shotgun was still a Mossberg shotgun; in the case at bar the Remington 700 rifle was no more; it had simply ceased to exist. All of its parts were discarded save the bolt assembly, the metal frame, and the screws holding them together. This is all that remained of the Remington 700 after Sinclair got through with it. The design of the rifle was no longer recognizable; this is another undisputed fact.
For the foregoing reasons, the trial court judgment is affirmed. All costs of this appeal are assessed to plaintiffs-appellants.
AFFIRMED.
YELVERTON, J., dissents and assigns written reasons.
KNOLL, J., dissents for the reasons assigned by YELVERTON.
YELVERTON, Judge, dissenting.
The majority and the trial judge threw out and refused to consider the counter-affidavits of two gun experts plaintiff filed in opposition to the motion for summary judgment. If these affidavits are considered, it becomes clear that there are genuine issues *158 of material fact precluding summary judgment. It is my opinion that it was error to throw out these affidavits.
The summary judgment evidence showed that the barrel action is the main working component of a rifle, and that the gun which Hines bought retained the barrel action as manufactured by Remington, a fact which also appears in the deposition of Remington's own expert, Stekl. Plaintiffs' experts' affidavits say that this barrel action had a trigger safety but no firing pin safety, which is undisputed, and that in this respect the Remington differed from a similar gun manufactured by its main competitor, Winchester, a fact likewise undisputed. The absence of a firing pin safety is a defect in design, according to the affidavits of plaintiffs' experts. Remington 700's, according to these affidavits, are prone to downfire, or go off without pulling on the trigger. In Hines' deposition, he stated that he was certain he never touched the trigger before the gun went off. The experts opined that the gun downfired in this case and that a firing pin safety, like Winchester installs on its guns, would have prevented the gun from going off, and thus would have prevented the accident. They said that: the fact that the trigger safety had been removed had no significance in the case, because the accident was not caused by the absence of a trigger safety but rather, it was caused by the absence of a firing pin safety; a firing pin safety would not have been removed; a gun with a trigger safety can downfire, a gun with a firing pin safety cannot.
Whether the absence of a firing pin safety was a defect and whether that defect caused the accident are material facts, and there are genuine disputes clearly presented in this record as to those facts.
Whether or not alterations were made in the product does not end the inquiry as to whether a manufacturer is liable for a defect in the product. For the manufacturer to be free of liability the alteration must be shown to have created the defect and thereby amount to an intervening or superseding cause of the injury. St. Pierre v. Gabel, 351 So.2d 821 (La.App. 1st Cir.1977). There is evidence in the record in the present case that the defective design was in the barrel action, that the action on the gun was the same Remington action as manufactured and that a firing pin safety would not have been removed in the "accurizing" process. These are genuine issues of material fact which can properly be decided only upon a trial on the merits.
By refusing to consider the affidavits of plaintiffs' two experts (Weisman and Greene), the majority permits a summary judgment in favor of Remington to stand. No attack is mounted against these experts' qualifications. One was a mechanical engineer with expertise in guns and the other was a gunsmith. In rejecting their affidavits, the majority sums up its reasons saying and I quote: "the opinions of plaintiff's `expert' witnesses were based on conclusions from what others had said, and appear to be no more than legal conclusions." These reasons for rejecting the affidavits, in my opinion, are patently wrong. Information supplied by the "others" on whom Weisman expressly relied were four lengthy depositions, all of which are in the recorddepositions given by George Greene, Earl Hines, James A. Stekl, and Fred Sinclair. Stekl, as pointed out above, was Remington's expert. Information on which Greene relied is referred to not only in his affidavit but also in his 107 page deposition which is also part of the record. Even if these experts' opinions were based solely on what others had said, that alone would not condemn their opinions as unreliable, for two reasons. First, what the "others" said was already part of the summary judgment evidence. Second, it is no bar to an expert's testimony that he obtained information supplied to him by other persons. State v. Austin, 282 So.2d 711 (La.1973). In State v. Fallon, 290 So. 2d 273 (La.1974), the Supreme Court said:
"The character of the evidence upon which an expert bases his opinion is ordinarily a matter which affects the weight to be accorded the expert's opinion. It has no bearing upon the admissibility of the evidence."
See also Federal Rules of Evidence 703.
The expert opinions contain no "legal conclusions" that I can find. What the *159 majority opinion perhaps disapproves in the affidavits is the expression of opinions on what are some of the ultimate issues in the case, like whether the absence of a firing pin safety was a defect in design. The affidavits should not have been rejected for that reason. There are times when an expert witness is permitted to give his opinion as to an ultimate issue in the case. Gage v. St. Paul Fire & Marine Insurance Company, 282 So.2d 147 (La.App. 3rd Cir.1973), writ denied, 284 So.2d 602 (La.1973). See also Federal Rules of Evidence 704.
Furthermore, the record does not disclose that defendants took affirmative measures in the trial court to preclude the consideration of the affidavits. There was no motion to strike or other formal objection made in the trial court to the content of the affidavits. In this respect the case is like Barnes v. Sun Oil Co., 362 So.2d 761 (La.1978) and Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981). The affidavits should not have been disregarded.
Not only are there genuine issues of fact regarding whether harm resulted from a design defect that made the product unreasonably dangerous to normal use, but there are also serious questions as to whether Remington violated a duty to warn. See LeBleu v. Homelite Division of Textron, Inc., 509 So.2d 563 (La.App. 3rd Cir. 1987). There is some evidence in the record that this action has a propensity to downfire. The summary judgment evidence shows that Hines neither knew nor should have known of that propensity. Although he fired his first Remington many times without mishap, the one and only time he handled the second gun it downfired. There was evidence that the tendency to downfire existed with or without the trigger pull modification. The evidence shows that Remington never warned any user of this risk. In contrast the summary judgment evidence reveals that Winchester bragged about the superiority of its firing pin safety. The risk was increased with trigger pull modifications. It was not uncommon for these guns to be modified for target shooting. Stekl, Remington's employee and expert, admitted that he owned two Sinclair-modified 700's himself. If Remington did not share with Hines its knowledge of the tendency of 700 action rifles to downfire, how could Hines, for all his sophistication and knowledge of the use of that action, have known of the danger? Was there a danger of downfiring inherent in the normal use of a Remington 700? Normal use is a term that includes all intended uses, as well as all foreseeable uses and misuses of the product. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). Having no experience with a downfiring weapon, did Hines possess any greater knowledge of this danger than an ordinary user? One of the plaintiff's experts expressed the view that it was dangerous to "target grade" this rifle. Should Remington have warned Hines of this danger? I think that this fact dispute should be tried on the merits. By placing on Hines the label "sophisticated user", the majority and the trial judge, without further explanation, shut the door on a merit trial at which plaintiffs might have been able to show that a duty to warn existed in the circumstances of this case.
I respectfully dissent.
NOTES
[*] Judge William Culpepper, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.