532 So.2d 968 (1988)
Edwinna Fannin, wife of the deceased, Elmer Allan DUNCAN, and Marion Natkowski
v.
LOUISIANA POWER & LIGHT COMPANY.
No. 88-CA-277.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 1988.
Eugene G. Taggart, Robert Rougelot, Monroe & Lemann, New Orleans, for defendant-appellant.
Francis P. Accardo, Wood Brown III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for third-party defendant-appellee.
Before CHEHARDY, KLIEBERT and GRISBAUM, JJ.
*969 GRISBAUM, Judge.
This case relates to the grant of a motion for summary judgment arising out of a products liability claim. We affirm.
The basic issues are two-fold:
(1) Whether the trial court erred in its finding that the record shows no issue of material fact demonstrating that the third-party defendant, Spider Staging Sales Company, Inc. (Spider), breached its duty to adequately warn third parties of the danger connected with the use of its equipment in the vicinity of electric lines, and
(2) Whether the trial court erred as a matter of law in its finding that third-party defendant Spider did not improperly design or defectively manufacture the scaffolding and its related components.
FACTS
On March 16, 1982, Elmer Allan Duncan and Marion Natkowski formed part of the painting crew for Boh Brothers Construction Company (Boh Brothers) at the Harvey Canal Bridge project. The structural work had been completed and only two crews, the painting crew and the cement finishing crew, remained on the job. Both crews were doing final touch up work on the columns and underside of the bridge structure. This work required the workmen to be raised or suspended from the ground in order to have access to the underside of the structure or the columns.
An aluminum air-driven winch scaffolding system was rented from Spider. The system consisted of aluminum scaffolding in the form of a "basket" connected to an independent air-driven winch and suspended by metal cables to which the winches were attached for the purpose of positioning the scaffolding in a vertical direction. Metal cables were used because the system is self-powered by the winch through which the metal cable is wound and driven. George Hero, plaintiffs' expert witness, testified that steel cables were used to support the scaffolding because the support cable had to wind through the air-driven motor winch to be positioned, and an insulated cable would more than double the size of the cable to run through the winch, making cable operation bulky. Hero testified that fibre cable or rope could have been used but stated that these materials conduct electricity if they are wet. Lastly, Hero stated that scaffolding systems like this are standard in the construction industry.
Just before the accident, Duncan and another man were on top of the bridge holding the metal cables while four men (Earl Buras, Gerald Barrette, Marion Natkowski, and Earl Jones) on the ground carried the scaffold basket down the length of the bridge as the men on top of the bridge walked the length of the bridge with the cables. The men were attempting to relocate the scaffold and intended to place it at the next adjacent column. After walking about 100 feet, the metal cable of the scaffolding unit intersected an uninsulated high power line running under the bridge. The resulting electrocution killed Duncan and injured Natkowski. Those involved in the move included Gerald Barrette, the foreman of the painting crew who directed the scaffolding move; Alvin Jones, the foreman of the concrete finishing crew, the crew using in the scaffolding at that time; Tom Ervin, Boh Brothers' safety manager; and George Hero, plaintiffs' expert witness.
Gerald Barrette testified that it is common knowledge among painters and construction workers that Spider units are not to be used in contact with electrical lines. He also stated that both he and his men knew the Spider units would transmit electricity. Barrette believed it was necessary to stay away from power lines, regardless of the material involved in the construction unit, since any material when wet or damp will conduct electricity.
The "Spider Staging Operators Manual" accompanying the scaffold and rigging equipment contains operating instructions, which, in pertinent part, read: "Electrical lines in the vicinity of the path traveled by the equipment should be de-energized. No live power lines are allowed within 10 feet of the scaffolding or any extension of it." Additionally, warnings attached to the equipment itself, in pertinent part, read:
*970 "CAUTIONELECTRICAL SHOCK HAZARD. METAL SCAFFOLDING DEVICES SHOULD NOT BE USED WHERE CONTACT MAY BE MADE WITH ELECTRICAL CIRCUITS. REFER TO INSTRUCTION LABEL."
Barrette admitted that he had read the warnings in the booklet which accompanied the basket before the accident and that these warnings specifically included warnings about contact with electrical lines. Barrette said he knew he had to keep a good distance away from high voltage electrical lines when working with the basket and that he would usually check the site when rigging a basket to make sure there were no electrical lines in the vicinity. Barrette had supervised three or four prior moves of the same scaffolding unit on the same job, and with over 20 years of painting and electrical work around wires, he considered himself experienced and knowledgeable in such matters, including the potential hazards associated with them.
Alvin Jones, whose concrete finishing crew was using the Spider scaffolding at the time of the accident, testified that he and his crew were aware of the dangers associated with working in proximity to high tension power lines and stated that he had read the entire Operators Manual as well as the warnings specifically pertaining to electrical hazards. He identified the warning affixed to the specific scaffolding unit in question and stated that he remembered seeing this warning on the unit itself. Jones went on to say that the same crew had moved the basket on approximately 16 other occasions, three of which involved removing the scaffolding under or around power lines. On those occasions, the crew came no closer than 10 or 15 feet from the power line and got around the power line by using a fibre rope to let down the cable and raise the cable. He testified that if the same procedure had been followed on the day in question, the accident would not have happened, and, if the crew thought that the line was as close as it was, the crew would have stopped and not run into it. Jones believed the contact with the line occurred because of the oversight of the people supervising the moving of the scaffolding unit who failed to pay attention to the presence of the line and because the line should have been insulated.
Tom Ervin, Boh Brothers' safety manager, testified that the only time the scaffold and its supporting wires were in the vicinity of the electrical distribution line was when they were being moved from column to column. Ervin stated that given the instructions and safety meeting he had had with supervisors and foremen at Boh Brothers concerning the general hazards of working around and in proximity to electrical lines, it was common knowledge in the construction field and specifically common knowledge among Boh Brothers workers generally that it is dangerous and hazardous for construction workers to work in proximity to electrical lines when they are working with metal equipment or equipment that can transmit electricity, such as the scaffolding. He admitted that this unit had been moved from column to column on many other occasions, including occasions which called for moving the unit underneath power lines, and that these moves were accomplished without incident. In Ervin's opinion, the accident occurred because of the failure of the Boh Brothers crew to notice that there was an electrical distribution line interfering with the move they intended to perform.
LAW
La. C.C.P. arts. 966 and 967 provide as follows:
Art. 966. Motion for summary judgment; procedure
A. The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiff's motion may be made at any time after the answer has been filed. The defendant's motion may be made at any time.
B. The motion for summary judgment shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the date of the hearing. *971 The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
C. A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.
Art. 967. Same; affidavits
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
If it appears from the affidavits of a party opposing the motion that for reasons stated he cannot present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
If it appears to the satisfaction of the court at any time that any of the affidavits presented pursuant to this article are presented in bad faith or solely for the purposes of delay, the court immediately shall order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees. Any offending party or attorney may be adjudged guilty of contempt.
Recognizing our statutory scheme, we will now address whether the pleadings and supporting affidavits of all parties establish that there remains an issue of material fact which gives rise to a viable cause of action.
ANALYSISISSUE ONE
The record shows the Operators Manual and the label affixed to the unit itself clearly and unequivocally warn against the danger of using the equipment near electrical lines. The Operators Manual accompanied the scaffolding wherever it went; it occupied a plastic tube near the instrumentation.
Both foremen involved in moving the scaffolding testified that they had read and understood both the Operators Manual and the warning label applied directly to the unit itself. The foremen stated that the workers who used or moved the scaffolding were aware that the scaffolding and its support cables were constructed of material which transmits electricity upon contacting high power voltage lines. The workers also knew contact with high voltage lines was to be avoided. The scaffolding was made with materials that are commonly used and are customary in the construction industry.
The duty to provide warnings of any danger inherent in the use of a product does not include dangers which are obvious to the ordinary user, or where, as here, the danger and the manner of avoiding it are common knowledge. Winterrowd v. Travelers Indem. Co., 462 So.2d 639 (La.1985); Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App.2d Cir.1987). In this case, furthermore, not only was the danger of contact with live electrical lines obvious, it was also specifically warned against by Spider.
Under our Louisiana jurisprudence
An adequate warning is one which, if followed, would make the product safe *972 for the user, that is, had the injured person complied with the warning, there would have been no accident. Cf. Benoit v. Ryan Chevrolet, 428 So.2d 489 (La. App. 2nd Cir.1982). The warning must be given in such a manner that it can reasonably be brought to the attention of the user, such as placing it on the container in which the product comes, placing it on the product itself or, where appropriate, providing an instruction or operation manual. See, for example, Broussard v. Continental Oil Company, 433 So.2d 354 (La.App. 3rd Cir.1983), writ denied, 440 So.2d 726 (La.1983); Cobb v. Insured Lloyds, 387 So.2d 13 (La.App. 3rd Cir.1980), writ denied, 394 So.2d 615 (La.1980).
Marshall v. Beno Truck Equip., Inc., 481 So.2d 1022, 1032 (La.App. 1st Cir.1985), writs denied, 482 So.2d 620 (La.1986).
Additionally, this scaffolding unit was not being used by people entirely unfamiliar with the construction environment. All of the men were Boh Brothers construction crew workers who were familiar with the scaffolding as well as the presence of high wire lines generally in the vicinity. These men were specifically aware of the danger of contacting high power lines. Another clearly delineated limitation placed on the duty to warn is that manufacturers and sellers are not liable for dangers known to the user. Holmes v. State through Dep't of Highways, 466 So.2d 811 (La.App.3d Cir. 1985), writ denied, 472 So.2d 31 (La.1985); Gary v. Dyson Lumber & Supply Co., 465 So.2d 172 (La.App.3d Cir.1985). There is no duty to warn a sophisticated user of dangers of which he may be presumed to know through his familiarity with the product. Hines v. Remington Arms Co., 522 So.2d 152 (La.App. 3d Cir.1988); Scott v. Terrebonne Lumber Co., 479 So.2d 410 (La.App. 1st Cir.1985), writ denied, 485 So. 2d 61 (La.1986); Ducote v. Liberty Mutual Ins. Co., 451 So.2d 1211 (La.App. 4th Cir. 1984), writ denied, 457 So.2d 15 (La.1984); Walter v. Valley, 363 So.2d 1266 (La.App. 4th Cir.1978).
The facts concerning the accident, the danger presented by LP & L's line and Spider's product, and the foremen's knowledge of the construction industry and specific warnings accompanying the Spider basket, are not in dispute. Therefore, there is no genuine issue of material fact regarding issue one.
ANALYSISISSUE TWO
It is well-established that instructions and warnings which are given are a significant part of the design and that a product which includes adequate warnings and instructions apprising users of the limitations of the product constitutes a properly designed product. Tenneco Oil Co. v. Chicago Bridge & Iron Co., 495 So.2d 1317 (La.App. 4th Cir.1986), writ granted, 497 So.2d 1006 (La.App. 4th Cir.1986), writ denied, 497 So.2d 1015 (La.1986). As recently stated by the Louisiana Supreme Court, a warning or other feature incorporated in a product may reduce the danger of a product, thereby freeing a manufacturer from product liability. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). Such is the case here.
George Hero, the plaintiffs' expert witness, testified that use of this type of scaffolding unit in construction jobs is common and customary in the industry. It is common knowledge that these types of metal support cables transmit electricity. Hero testified that it would be impractical to use insulated cable, since the metal cables are run through a winch which powers the unit up and down, and because any type of non-metallic material would also transmit electricity if it were wet. This is simply not the type of risk which the Louisiana law of products liability has imposed or should impose upon a manufacturer.
It certainly cannot be said that this Boh Brothers crew, which was aware of the electrical lines and was aware that the machinery they were moving would transmit electricity when it came into contact with that power line, exercised ordinary care by walking the metal cable which they were moving directly into and across a 1300-volt power line. The duty to warn extends only to risks inherent in normal use. Rhoto v. Ribando, 504 So.2d 1119 (La.App. 5th Cir.1987), writ denied, 506 So. *973 2d 1225 (La.1987). In Spurlock v. Cosmair, Inc., 509 So.2d 826, 829 (La.App. 1st Cir.1987), the court stated:
[I]n order for a product to be considered defective, it must be shown that it is unreasonably dangerous in normal use. Lytell, supra. For a product to be considered in normal use, the user must comply with the directions and warnings provided by the manufacturer of the product. (emphasis in the original and emphasis added.)
See also, Booker v. Revlon Realistic Professional Products, 433 So.2d 407 (La.App. 4th Cir.1983).
Here, the warnings were not followed, even though they were read and understood. If Spider's warnings had been followed, the accident would not have occurred. Accordingly, we find the trial judge was eminently correct in his finding that the mover-Spider was entitled to judgment in its favor as a matter of law.
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.