608 So.2d 1086 (1992)
Dawn Carter GAUTHIER, Individually and as Tutor of the Minor, Rachael Lynn Carter, Plaintiff-Appellant,
v.
McDONOUGH POWER EQUIPMENT, INC. & Allstate Insurance Co., Defendants-Appellees.
No. 91-682.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1992.
*1087 Jones, Jones & Alexander, J.B. Jones, Jr. and Jennifer Bercier, Cameron, for plaintiff/appellant.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, James Diaz and James Diaz Jr., Lafayette, for defendant/appellee McDonough.
Arnette & Riley, W.J. Riley, Jennings, for defendant/appellee Waterworks.
Before: STOKER, YELVERTON, JJ., and COREIL[*], J. Pro Tem.
JOSEPH E. COREIL, Judge Pro Tem.
This personal injury suit arises under the theory of products liability. On June 15, 1987, Rachael Gauthier, at age 12, was injured while operating a Snapper riding lawn mower. Rachael's mother, Dawn Carter Gauthier, filed suit individually and on behalf of Rachael. In the original petition filed on July 10, 1987, plaintiff named McDonough Power Equipment and Allstate Insurance Company as defendants. McDonough is the manufacturer of the Snapper mower[1]. The petition asserts claims based on defective design and failure to give adequate warning. Allstate is the insurer of William Carter, the owner of the lawnmower and grandfather of Rachael. The petition alleges he was at fault under strict liability and negligence theories.
Subsequent to this filing, plaintiff filed her first supplemental and amending petition on January 5, 1988, naming Jefferson Davis Waterworks District No. 4 (Waterworks) as an additional defendant, alleging that Waterworks was at fault in installing a water line in the area that the accident occurred, and improperly backfilling the hole, thereby causing the mowing machine to go out of control. Waterworks filed a third party demand naming Austin Industries, Inc. and Welsh Equipment as defendants. Austin was contracted by Waterworks for the construction of the piping system in question; Welsh was subcontracted by Austin to perform the construction installation of the waterline. Snapper filed a cross-claim against Waterworks and Welsh. Welsh then filed its cross-claim against Snapper. Plaintiff filed a second supplemental and amending petition naming *1088 Fuqua Insurance Company, Snapper's insurer, as a defendant.
Allstate was eventually dismissed from the suit on January 27, 1988.
The case was ultimately submitted to a jury. The jury returned a verdict in favor of the defendants, and judgment was rendered accordingly. Subsequently, the trial court denied plaintiff's motion for JNOV, as well as her motion for a new trial.
Plaintiff then filed this appeal, basically contending that the trial court erred in failing to grant her motion for JNOV because the substantial elements of her negligent failure to warn claim and defective design claim were proven at trial.

GENERAL FACTS
The record shows as follows: Mr. William Carter, Rachael's grandfather, owned a Snapper riding lawn mower which was manufactured in 1978. At the time of the accident, the mower was in a very poor state of repair. The brake which stops the blade, known as the "spindle brake," was inoperative; the electrical system was not functioning; the steering was loose; the seat was loose; nuts and bolts were missing; the mower had no service brakes; the deflector guard was missing; the auxillary brake was missing; the cable of the clutch brake was rerouted; the interlock safety system was disconnected; and the key switch was disconnected.
Mr. Carter had allowed Rachael to operate the lawn mower since she was at least ten years old. He testified that he considered Rachael big enough to use the mower. The testimony regarding the accident is conflicting. Rachael was operating the mower, cutting her grandfather's lawn, as she had done on numerous occasions. She testified she was not cutting on the slope of a ditch near the highway. However, an independent witness, Marlin Lewis, testified that he saw Rachael mowing in and out of the ditch. Rachael testified in deposition that she was never warned to stay away from the ditch, whereas her grandfather testified that he knew it was dangerous to ride the mower in the ditch and that he had instructed Rachael on each occasion that she used the mower, "never to go close to the ditch." In any event, at some point, the mower veered into the ditch and Rachael fell or was thrown off the mower. The mower continued to travel in a circle. It came upon her as she was laying near the area. The blades cut her leg, causing her severe injury.

DUTY TO WARN
The lawn mower had no warning affixed on the machine itself addressing children operating the machine. However, affixed to the machine were other warnings and instructions. On that list of instructions, at the top of the list, was the instruction to "Read the Manual" before operating.
The owner's manual did contain warnings about allowing children to operate the machine, as well as fifteen different warnings. The warnings on this model met or exceeded all applicable standards. As of 1978, there were no mandatory government regulations with respect to warnings on riding lawn mowers, and the earliest requirement for any type of warning on a riding lawn mower did not come until 1980. The voluntary standards among the members of the power mower industry are promulgated by the American National Standards Institute (ANSI), and these standards do not even require that children be mentioned. The statistical information about children being injured on a power mower indicated that this was a very rare occurrence and, defining children as persons between the ages of 0-14 years, the data reflect that there would be less than one injury per one hundred thousand use hours. Nevertheless, Snapper did include warnings on the affixed warning label with regard to the presence of children, despite the lack of an ANSI requirement. With respect to the manual, the ANSI standards required mention of children, and Snapper met that requirement. In response to other statistical information, the 1979 Snapper mowers did provide a revised warning label which warned against children operating the machines.
No owner's manual was furnished with the mower when Mr. Carter purchased it *1089 used in 1982 or 1983. However, he recalls having reviewed an owner's manual which came with another Snapper mower he purchased in 1974 or 1975. With regard to those warnings, his deposition testimony makes it clear that he would not have heeded the warning. He testified: "[I] (n)ever paid a lot of mind to it because like myself, I've been operating a mower since I was a small kid, myself, but I figure anyone overafter they 11, 12 years old, you know, they big enough to operate the mower." However, this testimony changed at trial.
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). Once the plaintiff proves that the lack of an adequate warning or instruction rendered the product unreasonably dangerous, his cause-in-fact burden is assisted by a presumption: when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions. The presumption may, however, be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances. Safeco Insurance Co. v. Baker, 515 So.2d 655 (La.App. 3 Cir. 1987), writ denied, 519 So.2d 130 (La.1988). An essential element of a cause of action based on failure to adequately warn of a product's danger is that there must be a reasonable relationship between the omission of the manufacturer and the injury. Bloxom v. Bloxom, 512 So.2d 839 (La. 1987).
The jury apparently believed that Mr. Carter was not denied the benefit of a warning; would not have observed any warning placed on the mower itself or altered his course of action; and that the presumed inadequacy of Snapper's warning did not cause Rachael's injuries. Under the evidence presented at trial, we find no manifest error in the jury's finding that Snapper did not breach its duty to warn of the dangers inherent in a child's operation of the mower.

DESIGN DEFECT
Plaintiff alleges that the machine should have had a dead man control/kill switch, which would have prevented the injury.[2] Plaintiff argues that this design defect directly caused Rachael's injuries. The jury disagreed and, on appeal, plaintiff contends the jury was erroneous and the JNOV should be granted.
To recover on the design defect theory, the user of a product must prove that the object was defective (i.e., unreasonably dangerous to normal use) and that his injuries or damages were caused by the defect. Hines v. Remington Arms Co., Inc., 522 So.2d 152 (La.App. 3 Cir.1988), writ denied, 524 So.2d 522 (La.1988). To prove her claim that the mower possessed a design defect, the plaintiff offered the testimony of her expert witness, J.B. Sevart, a mechanical engineer. Sevart testified that he did not expect consumers to read the operator's manual. He further testified that the bad repair of the mower had nothing to do with the accident. Sevart provided a videotaped demonstration of how a kill switch works. He pointed out to the jury, in that video, the quickness of the switch's ability to stop a mower. He also testified that a kill switch or dead man control system was available as early as 1964.
To challenge the testimony and evidence put on by the plaintiff, the defense offered its own expert, David Sassaman, also a mechanical engineer. Sassaman, after physically inspecting the machine, testified to the condition of the machine and its effect in relation to the accident, accepting Rachael's testimony. He testified, to-wit:
BY MR. DIAZ:
"Q You heard Mr. Carter testify, Dave?
A I did.

*1090 Q Okay. Based on the condition of the accident as you understood it, as testified to by: Mr. Carter, could you explain to the jury what safety features were missing on this machine that were probably a cause of the accident, if we accept Rachael's testimony?
A I can answer that.
Q Could you, please?
A Yes. There are three significant things that werethat I wouldthat I took from the photographs of the machine right after the accident, and on Rachael's testimony. And that is, number one, this machine, at that time, was not equipped with guarding on the right-hand side of the machine that would have a high probability of preventing contact to her leg, the blade contact.
Number two, the two most important operator controls for a person going along an edge of a ditch and having trouble are steering and brakes, the two most important controls. The steering was lame, maybe functional, maybe not, but it was in trouble because it was so loose. But most important, the brakes on this machine at normal mowing speedsI'm talking third gear in excess of 3,000 RPM's will stop this machine in one foot.
And there was plenty of time for an operator to, number one, exercise steering avoidance, turning away from the ditch as soon as they recognized there was a problem; number two, this machine, once the brake is applied, is capable of stopping within a foot. If those controls and a guard had been in place and functional, we wouldn't be here today."
He further testified that even with a dead man control which exists today, it would not have prevented the accident, where there was a bailout blade contact within a one-second time span. Dead man switches are not designed to prevent injury to involuntary dismount. It is a timed access and depends on where the person is in relation to the blades before the blades are brought to a stop. Sassaman gave very convincing testimony as to where Rachael fell off the machine and at what point the blade struck her. Based upon her fall time and on the fact that the machine continued to run, she would have had to be contacted by the blade in one second. He also noted that even if one had been in place on the Snapper, it would not have performed since the band brake and interlock brake systems were disconnected, as well as the whole electrical system.
Finally, Sassaman testified as to the Sevart video and its unreliability:
"Q Could you tell the jury whether, in your opinion, the circumstances under which he did the video tape were representative or similar to the mowing conditions that existed in this case, based on the testimony as you heard it?
A No, I[t] was not.
Q Why not?
A Well, the principal reason was the fact that I was, you know, observing the test and he was running it in snow, so you clearly would have seen a plume of snow coming out the discharge. And I was watching for that carefully and I didn't see that. And so that's a major deficiency in taking a blade out of the energy system, because that blade energy has to be dissipated back through the transmission and to the ground drive.
The other thing that I noticed, and that was based on observation, I couldn'tI couldn't tune my ear; I couldn't hear well enough as to whether the RPM's were up or not, but I would give just a rough guess that it didn't sound as if they were at full RPM's, but I could beI could be wrong about that.
And the other thing was that I observed the speed. The speed was relatively slow. Now, mowing speeds are done at least three miles an hour. That's pretty slow when you're out in a typical mowing operation, and that's what I assessed was the situation where Rachael was mowing. She was going to be mowing at a pace you would normally mow the yard because *1091 she had a big yard to mow. And so based on those observations, I do not consider that a valid test."
Defendants introduced the testimony of a Snapper employee, Richard Rhinehart, a mechanical engineer with expertise in designing Snapper equipment. He testified that the reason no dead man switch was employed on the 1978 model was due to the safety switch's unreliability. There were problems with weight shift in the seat, lack of reliability in the electrical connections, problems with the environment which resulted in reliability failures, i.e., the fertilizer in the grass, the moisture, the clippings, the dust. He also testified that Snapper consciously decided in the 1978 model not to use the seat switch because it would jeopardize the interlock system, which was already addressing other problems. He also agreed with Sassaman that the seat switch would never have worked in Rachael's case, as the interlock safety system on the mower had been disconnected.
He further testified that starting in the early 70's, Snapper began testing seat switches and also mechanical types of devices for stopping the blade. Finally, in 1982, a sufficiently reliable and dependable system went into production. He also testified that it was not until 1986 that an operator presence control or a dead man control requirement went into effect on lawnmowers manufactured for the model year 1987.
After a careful review of the evidence on both sides, we cannot say that the jury committed manifest error in its determination that the mower was not defective. The evidence clearly establishes that it was Rachael and her grandfather who failed to exercise good judgment.

JNOV
Plaintiff contends that the trial court should have either granted a JNOV or a new trial. The standard for determining whether to grant a JNOV is clearly established. In Scott v. Hospital Ser. Dist. No. 1, 496 So.2d 270 (La.1986), the standard is set out as follows:
"When `the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions [directed verdict and judgment n.o.v.] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....'"
In reviewing the JNOV, we apply the manifest error rule to the judge's conclusions on liability and quantum. Robertson v. Penn, 472 So.2d 927 (La.App. 1 Cir.1985), writ denied, 476 So.2d 353 (La. 1985). After a thorough review of the record and all the evidence therein, and in a light most favorable to the plaintiffs, and drawing all reasonable inferences most favorable to the plaintiffs, we find the trial court was not manifestly erroneous in denying plaintiff's motion for JNOV.
Plaintiff also argued that the trial court erred in refusing to grant plaintiff's motion for new trial, based on improper contact with the prospective jurors. Apparently, defendants' counsel instructed an investigator to perform background checks on the prospective jurors. In so doing, and without permission of the defendants' counsel, the investigator actually visited some of the prospective jurors. The investigator did not discuss the case, but was merely doing a personal background check. At voir dire, plaintiff had full knowledge of the contact. The jurors were questioned in that regard and as to whether each could give the parties a fair and impartial trial. Plaintiff's counsel failed or refused to give his challenges at that time, except as to one juror. It is clear that plaintiff's counsel knew all the relevant facts when the jury was selected. It is neither fair nor reasonable for a party to proceed to trial while holding in reserve an option to throw out the entire result if it is not to his liking. Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1 Cir.1985), writ denied, 479 So.2d *1092 922 (La.1985). Accordingly, we find that the objection has been waived; plaintiff cannot now be heard to complain.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiff.
AFFIRMED.
NOTES
[*] HONORABLE JOSEPH E. COREIL, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Snapper Power Equipment answered on behalf of McDonough Power Equipment, Inc.
[2] Dead man control designs cause a mower to either stop its forward progress or to stop the blade if the operator is not on the seat or depressing a pedal.