583 So.2d 544 (1991)
Richard ROMERO, Jr. and Tammie Hamrick Romero, Plaintiffs-Appellants,
Bituminous Casualty Corporation, Intervenor-Appellant,
v.
MERSON ELECTRIC COMPANY, W.W. Grainger, Inc., Defendants-Appellees.
No. 90-41.
Court of Appeal of Louisiana, Third Circuit.
June 26, 1991.
Rehearing Denied August 9, 1991.
*545 Pucheu & Pucheu, John H. Pucheu, Eunice, for plaintiffs-appellants.
Guglielmo, Lopez, Tuttle & Walker, Charles M. Jarrell, John R. Walker, Opelousas, for intervenor-appellant.
Voorhies & Labbe, W. Gerald Gaudet, Lafayette, for defendants-appellees.
Before STOKER, LABORDE and KNOLL, JJ.
LABORDE, Judge.
Plaintiffs, Richard Romero, Jr., and his wife, Tammie Hamrick Romero, filed suit for injuries stemming from Richard Romero's fall from a ladder on February 20, 1985. Named as defendants were Emerson Electric Company, the manufacturer of the ladder, and W.W. Grainger, Inc., the seller of the ladder.[1] Bituminous Casualty Corporation, Mr. Romero's employer's worker's compensation carrier filed a petition of intervention to recover benefits it paid or might in the future pay to Mr. Romero.
The case was tried before a jury which returned a verdict finding that both defendant, Emerson Electric Company, and plaintiff, Richard Romero, Jr., were at fault in causing Mr. Romero's accident. The jury assigned eighteen (18%) per cent of the fault to the defendant, fifty-two (52%) per cent to the plaintiff and thirty (30%) per cent to non-parties. It assessed the total of Mr. Romero's damages at $106,088.21 and awarded Mrs. Romero $19,250.00 for loss of consortium. By judgment dated April 17, 1989, the trial court entered a judgment in accordance with the jury's verdict. It awarded Mr. Romero $19,095.88 and Mrs. Romero $3,465.00 in damages. In addition, the trial court rendered judgment in favor of Bituminous Casualty Corporation in the amount of $2,715.88 for medical benefits and $5,040.00 for worker's compensation benefits.
Subsequently, the defendant, plaintiffs and intervenor filed motions for judgment notwithstanding the verdict (J.N.O.V.) with alternative requests for a new trial. The trial court granted the defendant's motion for J.N.O.V. and denied the motions of the plaintiffs and intervenor without assigning written reasons for its ruling. Both plaintiffs and intervenor appeal the June 2, 1989 judgment of the trial court granting defendant's J.N.O.V. and dismissing plaintiffs' demands. We reverse.

*546 FACTS
On February 20, 1985, Richard Romero, Jr. was injured when he fell from a height of over twenty feet because the "fly" or top section of the two-section fiberglass extension ladder he was descending suddenly collapsed into its base. The accident occurred while Mr. Romero was working for Oren Amy Metal Buildings, Inc. (Oren Amy). There were six other people present at the job site where Mr. Romero was injured. Four of them were regular Oren Amy employees at the time and the other two men were working for Oren Amy through Minute Man Temporary Services. The four regular Oren Amy employees all testified that they did not actually witness Richard Romero's fall but that they heard a noise which caught their attention. The two temporary employees did not testify at trial.
It was established at trial that the only fiberglass extension ladders used by Oren Amy were manufactured by Emerson Electric Company through its Louisville Ladder division and the ladder involved in the accident was identified as a Louisville Ladder product. Mr. John Monohan, testifying as a corporate representative of Louisville Ladder, identified the ladder he inspected when he visited Oren Amy's place of business as a Louisville Ladder company model CFG1128.
The only testimony presented regarding the accident itself, was that of the plaintiff, Richard Romero, Jr. He testified that on the morning in question, he had been working up on the top of the building site, sheeting a wall. Upon completion of this task, he shouted to Roselle Ewing, one of the temporary helpers, to bring him a ladder so he could climb down. Plaintiff stated that while Mr. Ewing was bringing the ladder over to him, and extending it, he was lowering his tools on a rope and so did not pay particular attention to exactly how Mr. Ewing extended the fly section of the ladder. Plaintiff stated that after he finished letting his tools down, he looked down at Mr. Ewing and saw that the ladder was fully extended. He also observed that Mr. Ewing was standing on the left side of the ladder with his right hand holding it. Plaintiff acknowledged that he did not look to see if the rung locks on the ladder were locked before he stepped on it. He just assumed the ladder was secure because it was standing up in an extended position. According to plaintiff, he put quite a bit of weight on the ladder and climbed down two or three rungs before finally letting go of the roof girt he was holding onto for support and balance. At this point, the fly section slid down inside the bottom section of the ladder and the plaintiff fell to the ground. He testified that he had his feet on two different rungs when the ladder collapsed. Plaintiff was taken by ambulance to Lafayette General Hospital.
Mr. Romero admitted that he had substantial experience using extension ladders, that he knew extension ladders can "hang up" or catch on a rung without locking, and that he can tell whether or not the rung locks are properly fastened.
John Monohan identified the fiberglass extension ladder as one manufactured by Louisville Ladder. Mr. Monohan also identified the type of rung lock on the extension ladder in question as a model LC1505. This model of rung lock had been used on all of his company's round rung fiberglass extension ladders, but it was no longer in use at the time of trial.
Mr. Monohan identified documents sent to customers and distributors as part of Louisville Ladder's recall program of the LC1505 rung lock. The document sent to distributors labelled "Important Safety Notice" stated that Rung Lock Replacement Kits were being offered because the old rung locks "may have a tendency to hang on the rung, giving the appearance that the rung locks are engaged when they are not. If a user climbs the ladder without the rung locks properly secured, the fly section may retract, causing the user to fall." Mr. Monohan also identified exhibits showing the design of the LC1505 rung lock and its replacement, the LC3334.
Mr. Monohan acknowledged that the rung lock model LC1505 has a tendency to hang up on the rung. He stated that there was no difference in the tendency of the *547 LC1505 and the newer model LC3334 to hang on the rung of a new ladder but that the LC3334 works better if the rung is damaged. Mr. Monahan also stated that the part of the model LC1505 that tended to hang on the rung depended on how the rung was damaged or dented. According to Mr. Monohan, when a rung lock hangs on a rung, a ladder can stand up in an erect position and give the impression that the rung locks are locked when in fact they are not. Mr. Monohan testified that his company was aware of problems in the retraction of its ladders equipped with the LC1501 rung lock as early as 1979, but that this was not considered as having any safety implications. Mr. Monohan also testified that practically all models of extension ladders can hang up.
Plaintiff's expert in the field of safety considerations, Mr. Herbert Bogert, testified that in his view, a fully extended extension ladder that gives a false indication of being securely locked when it is not locked is unsafe. He also stated that, in everyday use on a construction site, it was foreseeable that workers would not check the rung locks if the ladder stayed extended in an upright position and gave the impression the locks were secure. Mr. Bogert further testified that in his view, if a person approaches a fully extended ladder, and puts some weight on it without having it collapse, he is reasonable in assuming that the ladder is locked below. Under cross-examination, Mr. Bogert admitted that he could not explain exactly what was wrong with the LC1505 rung lock that caused it to hang up.

J.N.O.V.
Plaintiffs and intervenor in this case argue that the trial court erred in granting the defendant's motion for J.N.O.V.
The standard of proof which the trial court must use in deciding a motion for J.N.O.V. has been well-established by the jurisprudence. In Rougeau v. Commercial Union Insurance Company, 432 So.2d 1162 (La.App. 3rd Cir.) writ denied, 437 So.2d 1149 (La.1983) this court stated:
"In the present case the trial judge correctly adopted the standard to be applied in deciding whether a motion for judgment notwithstanding the verdict should be granted. The court's written reasons reflect its rationale:
"`Louisiana courts adopted the standard for ruling on a motion for a directed verdict applied by the Federal courts. The standard was enunciated by the Third Circuit in Campbell v. Mouton, 373 So.2d 237 (La.1979), which quoted the following language of the U.S. Fifth Circuit Court of Appeal in Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969):
"`"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's case but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."'" Rougeau at p. 1166.
In Alumbaugh v. Montgomery Ward & Company, Inc., 492 So.2d 545 (La.App. 3d Cir.), writ denied, 495 So.2d 304 (La.1986), this court summarized the standard of proof first enunciated in Rougeau by stating:
"We understand the standard as set out in Rougeau to mean that a motion for a judgment notwithstanding the verdict can only be granted by the district judge when, without weighing the credibility of the evidence or the witnesses, there cannot be but one reasonable conclusion as to the correct and proper judgment. Where there is such evidence upon which reasonable men might render a verdict in favor of the non-moving party, or where there is conflicting evidence, *548 a judgment notwithstanding the verdict should not be awarded." Alumbaugh at p. 548.
It is clear that in applying the standard of proof which the trial court should use in deciding the motion for J.N.O.V., it may not pass on the credibility of the witnesses or substitute its reasonable inferences of the facts for those of the jury.
In its judgment of June 2, 1989, the trial court apparently applied the proper standard in ruling upon the defendant's motion for J.N.O.V. It determined that the evidence and applicable law adduced at trial, pointed so strongly in favor of Emerson Electric Company that reasonable men could not arrive at a contrary verdict. Therefore, we must review the evidence in light most favorable to the plaintiffs, drawing all reasonable inferences most favorable to them, to determine whether the trial court committed manifest error. Silliker v. St. Landry Parish Police Jury, 520 So.2d 880 (La.App. 3rd Cir.1987).
The substantive law applicable in this case is products liability law. To recover under the design defect theory, a user of a product must prove that the object was defective (i.e., unreasonably dangerous to normal use) and that his injuries or damages were caused by the defect. Hines v. Remington Arms Company, Inc., 522 So.2d 152 (La.App. 3rd Cir.), writ denied, 524 So.2d 522 (La.1988). Thus, the jurors in the instant suit, must have concluded that there was a defect in the ladder and that this defect was a cause of Richard Romero's accident.
The evidence at trial showed that the LC1505 rung lock had a greater tendency to hang up on damaged rungs than its successor, the LC3334. As testified by Mr. Monohan, the difference between the LC1505 and the LC3334 is:
"[The LC3334] is better if the rung is damaged, which was the problem with the ladders in the cable television industry that led to the, the hanging up of the LC1505"
* * * * * *
"Because the angle that slides off of whatever the damage or benting [sic] of the rung that had previously occured [sic] because of the way they used their ladders and it varies from, what's a little dent to what's a big dent, to a little worn, to a lot worn, and the, or the LC3334 glides off easier than does the LC1505."
The recall letters introduced into evidence also showed the tendency of the LC1505 rung lock to hang on a rung. Furthermore, the jurors were able to see the rung locks on the Oren Amy ladder and notice how the nylon coating on the tongues of the rung locks had worn off. They could have concluded that the nylon coating on the tongues had worn off because of the way the tongues made contact with the rungs over long-term use. Thus, the jury could reasonably have determined that the LC1505 rung lock was defectively designed because of its greater tendency to hang up on a rung of an extension ladder during normal use.
Turning to the issue of causation, we find that there was sufficient evidence in the record to support a finding that defective rung locks were a cause of the accident. The record establishes that extension ladders are not supposed to stay upright in an extended position if the rung locks are not securely locked. Instead, the extended fly section should simply retract into the base on its own. Sometimes, however, an extension ladder will stay in an upright position because of a binding or bowing effect due to friction between the two parts as described by both Mr. Bogert and Mr. Monohan. This is simply a result of the physical nature of a ladder and cannot be considered a defect of the ladder. Mr. Monohan acknowledged that, although an extension ladder can hang up by binding, it is much less likely to do so when no one is on it than if someone is on it. In the instant case, plaintiff testified that before he got on the fully extended ladder, he saw Mr. Ewing standing to the side of it. Thus, he was not putting his weight on it at that time. The jury could reasonably have concluded that the ladder stayed in an upright extended position because the rung locks were hung up on the rungs without being *549 securely engaged, and that when Mr. Romero began to put weight on the ladder, the fly section of the ladder suddenly retracted.
Based on the entire record in this case reviewed in a light most favorable to the plaintiffs, we conclude that the trial court erred in its determination that reasonable and fair-minded jurors could not have possibly determined that a defect in defendant's ladder was a cause of Mr. Romero's injuries. Since we find that the trial court erred in granting the J.N.O.V. in favor of the defendant, plaintiffs' other arguments raised on appeal are moot.
For the above and foregoing reasons the decision of the trial court which granted the defendant's J.N.O.V. is reversed. The jury verdict and the trial court's judgment of April 17, 1989, in accordance with the jury verdict is reinstated. All costs of this appeal are assessed against defendant, Emerson Electric Company.
REVERSED AND RENDERED.
NOTES
[1] On motion of all parties, defendant, W.W. Grainger Inc., was subsequently dismissed from these proceedings.