646 So.2d 981 (1994)
Bruce STEVENS, Plaintiff-Appellee,
v.
HARTFORD INSURANCE COMPANY OF THE MIDWEST, et al., Defendants-Appellants.
No. 94-523.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1994.
Rehearing Denied January 18, 1995.
*982 Carol James Aymond Jr., Bunkie, for Bruce Stevens.
Kay Hilgerson Michiels, Alexandria, for Hartford Ins. Co. of the Midwest, et al.
Russell L. Potter, Alexandria, for Intern. Indem. Co.
Before GUIDRY, C.J., and KNOLL and WOODARD, JJ.
GUIDRY, Chief Judge.
This appeal arises from a rear-end automobile collision which occurred on May 7, 1993 in Pineville, Louisiana. The accident occurred on Donahue Ferry Road, a rural two-lane roadway, at approximately 1:30 p.m. Plaintiff-appellee, Bruce Stevens, rear-ended defendant-appellant, Thomas Johnson, when Johnson either slowed down or stopped his vehicle to roll over a snake that was crossing the road. Stevens sued Johnson, Hartford Insurance Company of the Midwest (Hartford), Johnson's insurer, as well as Stevens' own uninsured motorist carrier, International Indemnity Company. He claimed that his neck was injured as a result of the accident.
Trial of this matter was held on November 10 and 11, 1993. The jury apportioned fault as follows: 80% to Stevens and 20% to Johnson. The jury then assessed Stevens' damages as follows:

1) Physical injuries $ 50,000
2) Permanent partial disability 50,000
3) Medical expenses (past, present,
 future) 50,000
 _________
 TOTAL AWARD $150,000

*983 In response to plaintiff's motion for additur, new trial, and/or judgment notwithstanding the verdict (JNOV), the trial judge granted JNOV, reapportioning fault, 50% to each party, and granted plaintiff additur of $1,508.15 for property damage to his vehicle.
Johnson and Hartford appeal, contending the trial court erred in the following particulars:
1) granting JNOV on the fault apportionment issue;
2) awarding excessive damages; and,
3) denying defendants' motion in limine and admitting into evidence correspondence from Hartford to defense counsel stating the loss reserve amount for this case.
For the following reasons, we reverse the trial court's grant of JNOV on the fault apportionment issue; amend the jury award of medical expenses; and, in all other respects, affirm.

FACTS

The Accident
The fact that Stevens rear-ended Johnson in their proper lane of travel is not in dispute. However, the parties do not agree as to what occurred in the moments before the accident and, ultimately, the cause of the accident.
Johnson testified that he entered Donahue Ferry Road in the northbound lane from Whittington Drive, where his residence is located. He characterized Donahue Ferry road as a very curvy, blacktopped parish road with narrow shoulders. The speed limit is 35 miles per hour. Johnson was driving his 1981 Chevrolet pickup and was en route to Rapides General Hospital in Alexandria. The accident occurred approximately three-tenths of a mile from the point at which he entered the roadway. Johnson stated that, prior to turning onto Donahue Ferry Road, he stopped at the intersection and looked both ways. Upon seeing no traffic in either direction, he steered his truck into the northbound lane. He did not look into his rearview mirror as he pulled onto the road. Johnson accelerated to approximately 30 miles per hour, passed through a curve in the road and over an elevated area which he described as a hillcrest. When he reached the hillcrest, he saw the snake ahead of him in the right lane slithering toward the left lane. He decided to brake his truck and try to roll over it in an effort to kill it. Johnson stated that he tapped his brake "for less than a second" and his truck speed slowed to between 15 and 20 miles per hour. He emphatically denied coming to a complete stop in the road. Just after releasing his brake, Johnson was struck from behind by the 1969 Ford pickup truck driven by Stevens. Johnson stated that his vehicle was moving forward when it was struck. He accelerated somewhat and then stopped his truck about 100 feet beyond the point of impact. Johnson admitted that his actions were inappropriate under the circumstances.
On cross-examination, Johnson stated that, because he did not look at his speedometer at the moment his truck was hit, he could not say exactly how fast he was traveling at the moment of impact. He admitted that it was possible, albeit improbable, that he decelerated to five miles per hour. Johnson could not recall looking in his rearview mirror prior to braking his truck. He did not see Stevens until the collision occurred. He explained that he did not think anyone was behind him because he had not seen anyone approaching when he turned onto Donahue Ferry Road.
Stevens testified that he was on his way home from work in Bunkie, Louisiana when the accident occurred. At the time, he was employed by O'Leary Brothers as a sign fabricator and installer. He also drove large trucks to and from installation sites. On the date of the accident, he had returned from a cross-country trip to Maine and Georgia to install signs at Burger King locations. His time sheets indicated that, during the three and one-half days prior to the accident, he had worked 62.5 hours. Admittedly, he was tired.
Stevens and his partner returned their work equipment to the O'Leary Brothers facility in Bunkie, and he left for home. He was familiar with the Donahue Ferry Road because he had traveled it before on the way to his girl friend's home. Stevens stated that he was driving between 30 and 35 miles per *984 hour and first saw Johnson's truck as he passed over the aforementioned hillcrest. At that point, he realized that Johnson's truck was not moving. He slammed the brakes and slid into the rear of Johnson's truck. Stevens' tires left a 53 foot skid mark on the road.
Stevens explained that he could possibly have avoided the collision by veering to the right and going into the ditch. However, he stated that, by doing so, he would have probably flipped his truck or collided with the trees lining the roadway. He chose instead to brake hard and try to stop in the roadway before colliding with Johnson. Unfortunately, his efforts were unsuccessful.
Two accident reconstruction experts testified at trial. Dr. Joseph Blaschke, a transportation engineer, testified on behalf of defendants. He stated that the point of impact was 210 feet from the hillcrest and 450 feet from the end of the curve. The following vehicle had a clear line of vision from the end of the curve to the point of impact, with the driver of a following vehicle being able to see, at least, the top half of a preceding vehicle on the other side of the hillcrest. Dr. Blaschke pointed out that, when decelerating from 35 to zero miles per hour, a 50 foot skid mark takes 1.4 seconds. Factoring in a one to one and one-half second recognition and response time, which at 35 miles per hour takes up 77 feet, Dr. Blaschke concluded that Stevens first saw Johnson when he was 127 feet and, at most, 2.9 seconds away from Johnson. He opined that Johnson's truck should have been visible to Stevens from at least 400 feet back. Thus, Stevens traveled at least 273 feet in 5.3 seconds, during which time Johnson was in his direct line of vision, but failed to see Johnson. Dr. Blaschke opined that Stevens had ample opportunity to see Johnson ahead of him. His study of the accident revealed nothing to suggest that Johnson was completely stopped in the roadway. He concluded that the accident would not have occurred if Stevens had been driving attentively.
Gene Moody testified for plaintiff as an accident reconstruction expert. He opined that Stevens' recognition and response time would be between 1.5 and 2.5 seconds. At 35 miles per hour, a vehicle travels 128.63 feet in 2.5 seconds. Moody opined that Stevens traveled 181.63 feet (128.63 + 53 foot skid mark) in four seconds from the point at which he first saw the Johnson vehicle. According to Moody, Stevens acted reasonably in response to a sudden emergency created by Johnson. On cross-examination, he stated that the clear line of vision extended approximately 320 to 340 feet southward from the point of impact. The upper part of a preceding vehicle is visible to a following motorist from this distance. He concluded that Johnson was not justified in stopping in the roadway, failing to observe following traffic, failing to use his emergency flashers, and failing to accelerate upon hearing Stevens' tires squeal.

Medical Testimony
Stevens initially saw his general physician, Dr. John Lemoine, on May 18, 1993 complaining of headaches and shoulder pain. His examination revealed full range of motion in the neck area. Dr. Lemoine prescribed Anaprox D.S., an anti-inflammatory, and did not see Stevens again for this injury.
Dr. John Tassin, another general practitioner, first examined plaintiff on June 4, 1993. He detected decreased neck and right shoulder range of motion. Dr. Tassin prescribed an anti-inflammatory drug and pain medication. After a June 10, 1993 examination at which Stevens complained of left arm pain, Dr. Tassin referred him to Dr. Robert Rivet, a neurosurgeon. Dr. Tassin felt that he might have nerve root entrapment. He also prescribed physical therapy which, according to Dr. Tassin, worsened Stevens' condition after only four sessions. The therapy was thereafter discontinued.
Dr. Rivet first examined Stevens on July 12, 1993 and detected bilateral cervical spasms. According to Dr. Rivet, x-rays provided by Stevens revealed spondylosis at C5-6, a degenerative condition which pre-dated the accident. He opined that the trauma of the accident rendered the spondylosis symptomatic. To confirm his opinion, Dr. Rivet ordered a myelogram and a post-myelogram CT scan. The myelogram revealed a cut off nerve root, and the CT scan revealed foraminal narrowing at C5-6. Dr. Rivet related the *985 cause of Stevens' pain to the accident. Given the failure of conservative treatment in this case, Dr. Rivet recommended anterior fusion surgery, whereby the C5-6 disc is removed and replaced with a piece of bone. Stevens would then have to wear a cervical collar for three months and could return to normal activity five months after surgery. He stated that his fee for the procedure is between $5,500 and $6,500, and the hospital charges are normally twice as much.
While Stevens was in the hospital undergoing the aforementioned diagnostic tests, Dr. Rivet consulted Dr. Robert Martinez, a neurologist, who examined Stevens in the hospital. Dr. Martinez detected muscle spasms in his neck, which were more prevalent on the left side. Extension of his head and neck to the right side caused pain. Dr. Martinez also reviewed the test results, which he stated showed significant closure of the nerve canal on the left side at C5-6. He concurred with Dr. Rivet's opinion that the pre-accident non-symptomatic degenerative condition had become symptomatic as a result of the accident.
Dr. Robert Hanchey, a neurosurgeon, examined Stevens for an independent medical examination at the request of defendants. Dr. Hanchey also reviewed Stevens' medical records. He found no objective symptoms, such as spasms, related to the cervical spine. Stevens exhibited normal cervical range of motion and reflexes and his sensory examination was normal. Dr. Hanchey also found no evidence of nerve root impingement. He characterized the myelogram as "normal" and the CT scan as "equivocal at best", exhibiting only a minimal narrowing of the spinal canal at C5-6. This, according to Dr. Hanchey, is insufficient to cause nerve root compression. Dr. Hanchey diagnosed mild cervical spondylosis with possible foraminal stenosis at C5-6. Because of the mildness of Stevens' condition, he did not recommend surgery. Because of positive Tinel and Phalen tests, he opined that Stevens' arm pain was caused by left wrist carpal tunnel syndrome and recommended nerve conduction velocity tests. He did not relate the carpal tunnel syndrome to the accident. He strongly disagreed with the findings of Drs. Rivet and Martinez and refused to defer to their findings.
Dr. Robert Anseman, a rehabilitation specialist, performed nerve conduction velocity tests on October 26, 1993. The results revealed a left wrist carpal tunnel entrapment and a left elbow nerve entrapment. The next day, after reviewing these results, Dr. Martinez once again examined Stevens. His examination revealed the same cervical sensory and range of motion deficits as were detected on the initial examination. He once again recommended surgery.

OPINION

JNOV
The trial court granted JNOV on fault apportionment and reapportioned fault, 50% to each party. JNOV is authorized by La.C.C.P. art. 1811. However, this statute does not specifically delineate the situations in which a JNOV may be granted by the trial judge. In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), our Supreme Court enunciated the standards for consideration of a motion for JNOV and review on appeal of a grant of JNOV as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied....
In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court *986 erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. (Emphasis ours)
See also Romero v. Emerson Electric Company, 583 So.2d 544 (La.App. 3rd Cir.1991), writ denied, 589 So.2d 1054 (La.1991). Further, in deciding on the propriety of JNOV, a trial court should not weigh the evidence or substitute its own judgment for that of the jury. Tabarelli v. Allstate Insurance Company, 598 So.2d 683 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1091 (La.1992).
Applying these standards to the case sub judice, it is clear that the trial judge erred in granting plaintiff's motion for JNOV. The evidence directly related to the issue of fault apportionment conflicted at trial. Stevens claimed that Johnson was stopped in the roadway, while Johnson stated that he merely slowed down to between 15 to 20 miles per hour. Evidence presented at trial reflected that Stevens was fatigued, inattentive and following the Johnson vehicle too closely. The accident reconstruction experts also presented differing opinions as to how the accident occurred and its cause. Considering the conflicting nature of this and other evidence presented at trial, we conclude that reasonable men could reach different conclusions in the exercise of impartial judgment. The trial judge substituted his own judgment for that of the jury. In doing so, the court erred. We reverse the JNOV and reinstate the jury verdict which apportioned fault 80% to Stevens and 20% to Johnson.

Damages
Defendants challenge the propriety of three aspects of Stevens' award, to-wit: (1) excessive medical expenses; (2) excessive general damages; and, (3) additur of $1,508.15 for Stevens' property damage.
Generally, the trier of fact has much discretion in awarding damages. The court of appeal cannot disturb the trier's award absent a clear showing of abuse of discretion. Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1102 (La.App. 3rd Cir.1993), writs denied, 616 So.2d 701 and 702 (La.1993) and the cases cited therein. In determining whether an abuse of discretion occurred, we look first to the individual circumstances of the case before us, not to prior awards. Reck v. Stevens, 373 So.2d 498 (La.1979); Andres v. Liberty Mutual Insurance Co., 568 So.2d 651 (La.App. 3rd Cir.1990).
The jury awarded $50,000 in past, present and future medical expenses, which are considered special damages. In Eddy v. Litton, 586 So.2d 670, 675 (La.App. 2d Cir. 1991), writ denied, 590 So.2d 1203 (La.1992), the Second Circuit enunciated the standard of review of special damage awards as follows:
... The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Some special damages, such as medical and related expenses, cost to repair or replace damaged property, loss of wages, etc., are easily measured. A plaintiff pleading a special damage must produce some evidence by which that loss can be reasonably measured. Proof of a potential special damage or loss does not meet a plaintiff's burden of proof.... (citations omitted)
The evidence indicates that Stevens incurred $6,226 in pre-trial medical expenses. The only other evidence presented concerns the cost of surgery, to which Dr. Rivet testified. He stated his charge for the anterior fusion is, at most, $6,500 and that hospital charges are usually twice as much. Therefore, the highest possible award for future medical expenses would be $19,500. Clearly, the jury abused its discretion in awarding $50,000 in medical expenses. Considering the totality of evidence presented on this issue, the highest possible award within the *987 jury's discretion is $25,726. Accordingly, we will reduce the award to this amount.
The jury awarded $100,000 in general damages, segregating the award into $50,000 for physical injuries and $50,000 for permanent partial disability. While this award is on the high end of reasonableness under the present circumstances, we cannot say that it constituted an abuse of discretion on the part of the jury.
The additur to plaintiff's award for property damages is contested by defendants. They assert that, because a property damage interrogatory was not submitted to the jury, the judge erred in adding this amount to the judgment. In his pleadings, Stevens prayed for recovery of property damages. At trial, he presented an estimate of repair cost obtained from an auto dealer's service department. It is reasonable to conclude that the exclusion of the interrogatory was inadvertent. Given these circumstances, we conclude that the trial judge did not err in awarding additur in the amount of plaintiff's property damages, i.e., $1,508.15.

Motion in Limine
Prior to trial, defendants sought to exclude from evidence a letter written by Hartford's claims adjuster to defense counsel. The letter stated that Johnson stopped in the roadway and that Hartford had set up a $75,000 loss reserve account for this case. Defendants' motion contended that the letter was mistakenly and inadvertently attached to other documents which were sent to Dr. Blaschke in Texas to help him prepare for his deposition.[1] The motion in limine was based on the fact that, in defendants' view, the letter was a privileged communication and also constituted attorney work product prepared for litigation. The trial court deferred a ruling on the motion in limine to the merits of the case.
At trial, in conjunction with the testimony of Dr. Blaschke, plaintiff sought to admit the letter. Defense counsel objected on the aforestated grounds. The court admitted the letter into evidence to allow plaintiff's counsel to ask Dr. Blaschke "... whether he totally discounted the contents of it or considered the contents of it" in reaching his conclusions and opinions. A few moments later, defense counsel objected to the relevance of the $75,000 monetary figure in connection with Dr. Blaschke's testimony. The court ruled on the objection as follows:
... Its relevance would only be again in his reaching conclusions if he considered this document, if he read this document and considered it as being true that Mr. Johnson had stopped and that the insurance company valued at a certain level, and that he reached a conclusion that the claim was in fact valued at zero, the jury can use both his testimony and this document in determining whether his opinion is accurate or not accurate, but again, you are not to accept the document as being true or not true. It's only being used so that you can gauge this gentleman's testimony....
Soon thereafter, the court instructed the jury on this issue as follows:
First of all, this gentleman doesn't know who prepared that document. He does know who it was sent from, it was sent from [defense counsel]. Secondly, to go any further would be for this court to be allowing this document to be admitted as the truthfulness of the claim. I neither dispute nor do I acknowledge the truthfulness of this document or the accuracy of this document. This gentleman is an expert. He reaches his opinion, as you've heard him testify from examining the scene, from reports that are submitted to him, from even indications from an attorneyplease consider these factsthat is totally proper. This is another document that he had in his file. He either considered it or didn't consider it. That's the basis of allowing the document to be spoke [sic] of. You're to determine whether after considering this document, is it logical for him to reach the conclusions he *988 reached. If you conclude it is, that is solely within your province. If you conclude it is not reasonable, that is solely within your province. The allowing of the questioning about this document does not mean that I have an opinion one way or the other about the validity of or non-validity of this claim....
Defendants assert that the admission into evidence of the letter was error. La.C.C.P. art. 1424, which governs the discoverability of documents prepared for purposes of trial provides, in pertinent part:
The court shall not order the production or inspection of any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, expert, or agent in anticipation of litigation or in preparation for trial unless satisfied that denial of production or inspection will unfairly prejudice the party seeking the production or inspection in preparing his claim or defense or will cause him undue hardship or injustice.... (Emphasis ours)
This "opinion work product" rule is distinct from and broader than the attorney-client privilege and may encompass any writing prepared in anticipation of litigation. Hodges v. Southern Farm Bureau Casualty Insurance Company, 433 So.2d 125 (La.1983). The letter in question clearly falls within this work product exception. It was prepared by a representative of the adverse party in anticipation of litigation and contained details intended to be used by the attorney in preparing a defense to the claim. As such, it is not discoverable. It is axiomatic that a document that is not discoverable is not admissible at trial over timely objection.
We also find that the letter is confidential information subject to the attorney-client privilege. La.C.E. art. 506(B) provides, in pertinent part, as follows:
B. General rule of privilege. A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is:
(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.
The letter was written by Hartford for purposes of "facilitating the rendition of professional legal services" to defendants. This communication was clearly intended to be confidential and would have remained as such had defense counsel not mistakenly attached it to other documents sent to Dr. Blaschke.
The trial judge erred in allowing the letter into evidence in conjunction with Dr. Blaschke's testimony. We must determine whether the error, when compared to the record as a whole, had a substantial effect on the outcome of the case. Lacombe v. Dr. Walter Olin Moss Regional Hospital, 617 So.2d 612 (La.App. 3rd Cir.1993), writ denied, 626 So.2d 1187. In other words, appellants also must show that the error was so prejudicial to warrant reversal of the judgment.
Although the trial judge erred, he also clearly explained to the jury the limited scope of consideration for which the letter was being admitted into evidence. An examination of the jury's verdict reveals that the error, when compared to the record as a whole, did not substantially prejudice the result. While the jury did award $150,000 in damages, twice the amount mentioned in the letter, it also reduced this award by 80% for plaintiff's fault. Thus, Stevens' recovery was $30,000 under the original jury verdict. Given these circumstances, we conclude that the error was not so prejudicial as to warrant reversal.

DECREE
For these reasons, the JNOV granted in favor of plaintiff, Bruce Stevens, is reversed and the jury verdict on the fault apportionment issue is reinstated. Further, plaintiff's award for medical expenses is reduced to $25,726. In all other respects, the judgment is affirmed.
Costs of this appeal are to be paid one-half (½) by plaintiff-appellee, Bruce Stevens, and *989 one-half (½) by defendants, Hartford Insurance Company of the Midwest and Thomas Johnson.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND, RENDERED.
NOTES
[1] Plaintiff's attorney appeared personally at the deposition while defense counsel appeared by telephone. Apparently, plaintiff's counsel first became aware of the existence of this letter while conducting the deposition. The deposition transcript was not entered into evidence, but Dr. Blaschke did testify at trial.