664 So.2d 515 (1995)
Christine HERPIN, Plaintiff-Appellee,
v.
Philip H. WITHERSPOON, D.D.S., Defendant-Appellant.
No. 95-370.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1995.
*517 Scott Edward Frazier, Calvin E. Woodruff Jr., Abbeville, for Christine Herpin.
Robert Leon Ellender, James Allen Lochridge Jr., Lafayette, for Philip H. Witherspoon D.D.S.
Before DOUCET, C.J., and THIBODEAUX and SULLIVAN, JJ.
SULLIVAN, Judge.
This is a medical malpractice case. Plaintiff-appellee, Christine Herpin LeBoeuf[1], alleged that she suffered personal injury resulting from the maltreatment of her temporomandibular joint dysfunction (TMD) by defendant-appellant, Dr. Philip Witherspoon, D.D.S. Defendant treated LeBoeuf's TMD in two phases with an anterior repositioning splint followed by an upper palatal expander. LeBoeuf alleged such treatment was below the standard of care. After a bench trial, the trial court rendered judgment in favor of LeBoeuf and against Dr. Witherspoon and CNA Insurance Company and awarded LeBoeuf damages as follows:

Past Pain and Suffering $45,000
Future Pain and Suffering 25,000
Cost of Remedial Treatment 2,800
 ________
TOTAL AWARD $72,800

From this judgment, Dr. Witherspoon and CNA Insurance Company suspensively appeal[2] and specify the following three errors:
1) Applying the "Locality Rule" to the determination of the standard of care;
2) Excluding the deposition of defense expert, Dr. Henry Clifton Simmons; and
3) Finding that Witherspoon committed malpractice.
Plaintiff filed an answer to the appeal seeking an award for the cost of future orthodontic treatment which was denied by the trial court.
For the following reasons, we find no merit to defendants' assignments of error and affirm the trial court's finding of malpractice. Furthermore, we conclude that the trial court erred in denying LeBoeuf's claim for the cost of future orthodontic treatment. Therefore, we award her $3,000 for this element of damages.

FACTS
LeBoeuf's TMD resulted from a 1987 tonsillectomy and adenoid removal surgery. After the surgery, she began to experience popping and clicking in her jaws along with pain in her ears. She went to her dentist, Dr. Fontenot, who initially diagnosed TMD. On the advice of a friend, she made an appointment to see Dr. Witherspoon, a general dentist who limits his practice to the treatment of TMD. Dr. Witherspoon practices in Lafayette.
*518 LeBoeuf first saw Dr. Witherspoon in June 1990. According to her, he diagnosed bilateral TMD and recommended a two-phase treatment of her condition. He explained the two phases of treatment to her. Phase I consisted of the wearing of an anterior repositioning device known as a Gelb appliance. This splint is designed to push the mandible (lower jaw) forward in an effort to "recapture" the displaced discs into their proper position in the joint between the condyle and fossa. Phase II consisted of the placement of an upper palatal expander device.
LeBoeuf was fitted for the phase I anterior repositioning device on June 5, 1990. Her father paid for the phase I treatment. She wore it 24 hours a day. At each successive visit, Dr. Witherspoon would "build up" the surface of the splint. She explained that, because of the stretching taking place, she was in constant pain while wearing this Gelb appliance. She was restricted to a soft diet, could not talk well, and had difficulty sleeping. According to LeBoeuf, her pain increased with time and she lost between 15 and 20 pounds.
In August 1990, LeBoeuf sought a second opinion from Dr. John Oubre, D.D.S., an orthodontist. He recommended that she discontinue use of the Gelb appliance and return in two weeks for an evaluation of possible treatment alternatives. For reasons which are undisclosed in the record, LeBoeuf did not return to Dr. Oubre and continued to wear her Gelb appliance.
In December 1990, Dr. Witherspoon removed the lower Gelb appliance. LeBoeuf stated that, at that point, a front tooth was sticking straight out and pushing her lip outward. Her posterior (back) bite had also changed to the point at which she could not "feel her bite."
LeBoeuf was fitted with the phase II upper palatal expander on December 24, 1990. She borrowed $2,300 from Kaplan State Bank to pay for the phase II treatment. This upper jaw treatment device had a screw which she was required to open one-quarter of a turn twice a week to expand the upper palate. LeBoeuf testified that her pain increased dramatically when this device was placed in her mouth and during the weeks thereafter. Her palate became very swollen and sensitive. On several occasions, the palate bled. She saw Dr. Witherspoon four times after he inserted this phase II device. On her final visit, April 4, 1991, LeBoeuf decided to have the device removed and discontinue treatment with defendant.
On May 16, 1991, LeBoeuf was examined by Dr. Antime Landry, D.D.S., an orthodontist who had fitted her with braces when she was an adolescent. She was in acute pain and her mandible was immovable. Dr. Landry determined that the upper palatal expander had pushed LeBoeuf's teeth out beyond her jawbone and exposed her upper molar roots.
On June 18, 1991, she was examined by Dr. James Pearce, D.D.S., a Lafayette dentist who also limits his practice to the diagnosis and treatment of TMD. Dr. Pearce took a model of her teeth on June 25, 1991. He diagnosed her condition as bilateral displaced TMJ discs, TMJ capsulitis, myofascial pain of mastication muscles, bruxism, class III skeletal malocclusion (open bite) between upper and lower jaw and gingival cleft of lower left central incisor (gum receded from tooth with a portion of the root exposed). He recommended flat plane splint therapy, which he described as being more conservative in nature than the anterior repositioning therapy employed by Dr. Witherspoon.
On March 31, 1992, plaintiff filed the present suit for damages against Dr. Witherspoon. CNA Insurance was not included in her petition as a party-defendant.
Due to financial constraints, LeBoeuf was unable to begin treatment with Dr. Pearce until November 1993. At that time, she was fitted with a flat plane splint. The purpose of a flat plane splint is to allow the TMJ to seat in a proper physiological position so the soft tissue can heal and create a soft tissue "pseudodisc" which then cushions the joint. Under Dr. Pearce's care, her pain and symptoms have decreased. When she began treatment with Dr. Pearce, she rated her pain as nine on a scale of one to ten. Just before trial, she rated her relative pain as a three on the same scale.
*519 In defense of his treatment of LeBoeuf, Dr. Witherspoon stated that he diagnosed her with a retruded (pushed back) mandible and forward head posture. His plan was to advance the mandible forward through the use of anterior repositioning therapy. According to Dr. Witherspoon, this frequently affects a reduction in the displaced disc and a cessation in muscle spasms. The goal is to return the condyle back on the disc and reduce or eliminate pain. He explained that, during phase II, rubber bands are used to speed up the eruption of teeth necessary to close the posterior open bite. Phase II treatment is necessary to prevent the mandible from returning to its pre-phase I position. The long term success of this treatment method is dependent upon "recapture" of the disc at its physiologically correct position.
Dr. Witherspoon stated further that LeBoeuf quit the treatment regimen well before the completion of phase II. He had no intention to leave her teeth in the position they were in when she prematurely quit treatment on April 4, 1990.

LOCALITY RULE
The trial court determined that, since Dr. Witherspoon is a general dentist and not a specialist, he should be held to the standard of care exercised by other dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale under similar circumstances. The defendant contends on appeal that a broader or national standard of care should have been applied in this case because, by limiting his practice to TMD treatment, Dr. Witherspoon engaged in a de facto specialty practice. This TMD treatment "specialty," defendant argues, has uniform standards of care throughout the country. Additionally, defendant asserts that the purpose of the locality rule, to protect rural doctors who have no access to the techniques or knowledge of doctors who practice at large metropolitan medical centers, would be subverted by its application to this case.
Proof of the standard of care is the first of a three-prong burden of proof in a medical malpractice case. In this regard, La.R.S. 9:2794(A) provides pertinently as follows:
A. In a malpractice action based on the negligence of ... a dentist licensed under R.S. 37:751 et seq.....the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... dentists ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by... dentists ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; [and]
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The focus of our inquiry is on subparagraph (1), which provides the distinction between local and national or specialty-wide standards of care. The local standard applies to general practitioners, while the national standard applies to specialists. At trial, neither party disputed the fact that the treatment of TMD is not considered a specialty or subspecialty within the broader practice of general dentistry. As noted by the learned trial judge, although some general dentists limit their practices exclusively to TMD treatment, the dental profession does not recognize this limitation of practice as a specialty.
Dr. Witherspoon testified that he is a general dentist who exclusively treats TMD. Plaintiff's expert, Dr. Pearce, who also limits his general dentistry practice, agreed that such a limitation does not constitute a specialty. Since TMD treatment is not considered a specialty, the locality rule applies. *520 Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378 (La.1992); Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978); Koslowski v. Sanchez, 563 So.2d 937 (La.App. 1 Cir.1990), reversed on other grounds, 576 So.2d 470 (La.1991). Therefore, the applicable standard of care is that which should be exercised by a general dentist treating TMD in a similar community or locale and under similar circumstances. The trial court did not err in applying the locality rule insofar as the plaintiff's burden of proof is concerned.

EXCLUSION OF DR. SIMMONS' DEPOSITION
The deposition of Dr. Henry Clifton Simmons, a practitioner of general dentistry from Nashville, Tennessee, was taken on May 20, 1994. At trial, defendant attempted to introduce this deposition into evidence. Plaintiff's counsel objected to the deposition's introduction on the basis that "the testimony of Dr. Simmons reveals that he has no knowledge of the standard of care employed in the community of Southwest Louisiana."
The trial judge sustained plaintiff's objection, noting that he is bound by the locality rule. In doing so, he relied upon Moore v. Curry, 577 So.2d 824 (La.App.2 Cir.), writ denied, 580 So.2d 674 (La.1991) in which the second circuit upheld the trial court's grant of the plaintiff's motion in limine to exclude the deposition of a Georgia general dentist. The trial judge also commented that, "[i]n anticipation of the trial, I read the first 50 pages of that deposition. So I will forget what I read." The trial court did, however, allow the defense to proffer the deposition into the record. The entire deposition, which includes 97 pages of Dr. Simmons' testimony, is contained in the appellate record.
Dr. Witherspoon contends on appeal that the trial court erred in concluding that Dr. Simmons had insufficient knowledge of the standard of care applicable to Lafayette and southwest Louisiana. Defendant further asserts that, at pages 61-64 of the deposition, Dr. Simmons adequately explained his familiarity with the applicable local standard of care. According to the defendant, the trial court's admitted failure to read this portion of the deposition resulted in the wrongful exclusion of the deposition. The defense characterizes the exclusion from evidence as an error of law which clearly prejudiced the defense.
The trial judge's ruling on the exclusion of the deposition was based primarily on his prior ruling that the locality rule applies. In the above section of this opinion, we found that this predicate ruling was correct. Our review of the deposition of Dr. Simmons reveals that, despite the fact that the trial judge did not read the portion in which Dr. Simmons explained his knowledge of the local standard of care, his ruling was nevertheless correct because Dr. Simmons clearly did not possess the requisite knowledge of the local standard of care. Dr. Simmons admitted that he was not licensed to practice nor had he ever practiced in the state of Louisiana. He claimed, however, to be familiar with southwest Louisiana treatment practices for TMD through the information he read "in this case" and by testifying in another case involving Dr. Hugh Oeser from Covington, Louisiana. He admitted, however, that the Oeser case did not involve the treatment of TMD.
We conclude that the trial court did not err in excluding the deposition of Dr. Simmons. Additionally, its reliance on Moore, 577 So.2d 824, was well placed. The facts of this case are slightly different than in Moore, wherein the Georgia dentist admitted to having absolutely no knowledge of the standard of care in Louisiana. In the case sub judice, the deponent claimed to have some knowledge of the Louisiana standard of care, but it was clearly case-specific and insufficient to qualify him as an expert in this case.

FINDING OF MALPRACTICE
The trial court determined that plaintiff met her three-prong burden of proving malpractice on the part of Dr. Witherspoon. Defendant initially contends that the trial court's application of the locality rule and exclusion of Dr. Simmons' deposition constituted legal errors which severely prejudiced the defense case such that the manifest error standard of review should not apply. Based on our affirmation of these two alleged legal *521 errors, we disagree with the defendant's contention that we should conduct a de novo review of the record.
The law and jurisprudence does not require perfection or absolute precision in medical diagnosis and treatment. A general dentist is not required to exercise the highest degree of care possible, but he must exercise the degree of skill ordinarily employed by his professional peers under like circumstances. He must use reasonable care along with his best judgment in the exercise of that skill. Matthews v. Louisiana State Medical Center in Shreveport, 467 So.2d 1238 (La.App. 2 Cir.1985). A doctor's professional judgment and conduct is to be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Charpentier v. Lammico Insurance Co., 606 So.2d 83 (La. App. 3 Cir.1992); Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir. 1991).
An unsuccessful course of treatment is not per se an indication of malpractice. The opinions of medical experts are necessary to the determination of the applicable standard of care and the inquiry as to whether that standard was breached. These opinions, while not controlling, are persuasive. Ultimately, the factfinder must evaluate conflicting expert opinions in relation to all the circumstances of the case. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991) and the cases cited therein. When the experts' opinions are in conflict concerning compliance with the applicable standard of care, the trial court's determinations on this issue will be granted great deference. It is the sole province of the trier of fact to evaluate the credibility of such experts and their testimony. Charpentier, 606 So.2d 83.
LeBoeuf presented the testimony of Dr. Pearce, a general dentist, and Drs. John Oubre and Antime Landry, orthodontists. Dr. Pearce stated that the local standard of care requires conservative treatment which affects reversible changes for those with displaced discs. He explained that this involves the use of a flat plane splint as opposed to the anterior repositioning therapy splint employed by Dr. Witherspoon. The goal of flat plane splint therapy is to remove pressure from the joint and create fibrous scar tissue which acts as an "pseudodisc." Through this modality of treatment, Dr. Pearce stated that his patients experience a reduction in pain and that some become asymptomatic. He said further that long term anterior repositioning therapy by use of the Gelb appliance and upper palatal expander does not meet the applicable standard of care. Dr. Pearce knew of no other dentist in Lafayette, Baton Rouge, or New Orleans who uses this treatment method. Further, he stated that, under his care, LeBoeuf has reduced symptomatology and is progressing well.
Dr. Oubre echoed the sentiments of Dr. Pearce when he stated that the standard of care involves conservative treatment modalities which do not involve irreversible changes to the patient's chewing apparatus. He treats TMD patients on a primary care basis, and they constitute between 10 and 20 percent of his practice. Like Dr. Pearce, he employs flat plane splint therapy and claimed a 90 to 95 percent success rate for decreased pain and increased function. Dr. Oubre explained that the use of anterior repositioning therapy at the initial phase of treatment is not within the local standard of care. He also questioned the propriety of using an upper palatal expander on a non-growing adult patient. At best, he said, it would bend the alveolar bone which supports the teeth. Dr. Oubre concluded emphatically that the use of long term anterior repositioning therapy with a Gelb appliance should not be done in Lafayette or anywhere else.
Dr. Landry stated that the primary care treatment of TMD patients constitutes approximately 15 percent of his practice. In all of his treatment, he employs flat plane splint therapy. He explained that the standard of care of TMD cases is geared toward relieving the joint inflammation and reducing the patient's pain. This should be accomplished by seating the condyle into its normal physiological position within the fossa by using flat plane splints. No irreversible modalities are to be employed. According to Dr. Landry, the use of anterior repositioning therapy to *522 move the mandible forward and the use of an upper palatal expander on a non-growing adult are not within the southwest Louisiana standard of care. As a result of his examination of LeBoeuf, he concluded that her posterior open bite, overexpanded upper teeth, and extruded incisor were caused by this below standard treatment.
Dr. Witherspoon testified in his defense and also presented the testimony of Dr. Donald Brown, an orthodontist licensed in Louisiana, Texas and North Carolina. Dr. Witherspoon stated that his treatment modality is accepted in practice and that one other local dentist, Dr. Edward Moise, employs anterior repositioning therapy to treat TMD. He cited several scientific studies which revealed impressive success ratios when such treatment is employed. He explained that, by bringing the mandible forward, a reduction in the meniscus is frequently affected and muscle spasms cease. Thereafter, all that remains is to do orthodontics to stabilize the patient at that position. Dr. Witherspoon admitted that he did not offer LeBoeuf flat plane splint therapy as an alternative to anterior repositioning therapy. However, he asserted that plaintiff's problems were caused, at least in part, by her cessation of treatment prior to the completion of phase II. According to Dr. Witherspoon, he had no intention to leave her teeth in the position they were in when she prematurely quit phase II treatment.
Dr. Brown stated that he practices in Covington, Baton Rouge and Bogalusa and uses long term anterior repositioning therapy in treating his TMD patients. He uses the same two-phase treatment as did Dr. Witherspoon in this case, which includes a lower Gelb appliance and an upper palatal expander in non-growing adult patients. According to Dr. Brown, the research on this modality shows that the condyle moves downward and slightly forward, and the mandible moves downward. In a recent study he did comparing long term anterior repositioning therapy against no treatment, those patients who received anterior repositioning therapy improved significantly while those patients with no treatment saw no change in condition.
He argued that nothing precludes the use of long term anterior repositioning therapy. In his opinion, the clinician should have discretion to use such treatment if he so chooses. Dr. Brown characterized the divergence of agreement on proper treatment methods as a "healthy" disagreement within the profession over two acceptable treatments. He explained that TMD does not have just one accepted standard of care. In his opinion, Dr. Witherspoon treated LeBoeuf appropriately and used a proper technique. He asserted that, had she not discontinued treatment, her mandible would have remained in the new position and her teeth would have been stabilized with proper orthodontic therapy.
The trial court was faced with conflicting dental and orthodontical expert testimony on the propriety of using anterior repositioning therapy. Faced with two contradictory and reasonable views of the evidence, the trial judge determined that the evidence presented preponderated in the plaintiff's favor. Given the deferential standard of review, we cannot say that the trial court erred in finding that the plaintiff carried her burden of proof. In light of the record which we have reviewed in its entirety, the trial court's conclusion was reasonable.

FUTURE ORTHODONTIC CARE
The trial court denied LeBoeuf's claim for future orthodontic care. In his written reasons for judgment, the trial judge noted that Dr. Pearce stated "that her only definite future need would be the realignment of her lower teeth. Dr. Pearce spoke of future orthodontic care, but was unable to establish for this Court, with any degree of certainty, that such care would be needed." LeBoeuf appeals from this claim. For the following reasons, we conclude that LeBoeuf is entitled to recover for the cost of her future orthodontic care.
We find that the above-cited language from the trial court's written reasons is somewhat inconsistent. Realignment of her teeth is characterized as both "a definite future need" and as an uncertainty. Dr. Pearce stated that LeBoeuf would need future orthodontics to restraighten her front *523 and back teeth. He said such treatment would probably last between 18 and 30 months at a cost of between $3,000 and $4,500. Dr. Oubre agreed that LeBoeuf would need braces for between 18 and 24 months at a cost of between $3,000 and $3,500. This testimony was not contradicted.
In Stevens v. Hartford Insurance Company of the Midwest, 94-523 at p. 10 (La.App. 3 Cir. 11/2/94), 646 So.2d 981, 986; writ denied, 95-0311 (La. 3/24/95), 651 So.2d 296, we quoted with approval from the second circuit case of Eddy v. Litton, 586 So.2d 670, 675 (La. App. 2 Cir.1991), writ denied, 590 So.2d 1203 (La.1992), which enunciated the standard of review applicable to special damages:
The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Some special damages, such as medical and related expenses, cost to repair or replace damaged property, loss of wages, etc., are easily measured. A plaintiff pleading a special damage must produce some evidence by which that loss can be reasonably measured. Proof of a potential special damage or loss does not meet a plaintiff's burden of proof.... (citations omitted.)
Under the circumstances of this case, we conclude that plaintiff sufficiently proved her entitlement to future orthodontic treatment. It was not disputed at trial that, as a result of Dr. Witherspoon's treatment, she had a posterior open bite and an extruded incisor. Her teeth will require straightening through orthodontics at the completion of her treatment with Dr. Pearce. We award LeBoeuf $3,000 for future orthodontic care.

DECREE
For these reasons, we reverse that portion of the trial court's judgment which denied plaintiff an award for future orthodontic care and award plaintiff-appellant, Christine Herpin LeBoeuf, $3,000 for future orthodontic care. In all other respects, the judgment is affirmed.
Costs of these proceedings are to be paid by Dr. Philip Witherspoon, D.D.S.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] At some point between the time of her treatment with Dr. Witherspoon and the trial, plaintiff married Richard LeBoeuf. Although she remains designated as "Herpin" in the caption, we shall refer to plaintiff as "LeBoeuf" in this opinion.
[2] The record indicates that, in the motion for appeal, the appellants are Dr. Philip Witherspoon and CNA Insurance Company. The judgment was also rendered against Dr. Witherspoon and CNA Insurance. However, the record does not contain a pleading through which CNA Insurance Company was officially made a party-defendant to this litigation. At the outset of trial, however, the parties stipulated that CNA Insurance Company provides coverage to Dr. Witherspoon.