690 So.2d 812 (1996)
Michelle Lynn MAGOS, Plaintiff Appellant
v.
Dr. Jon A. FEERICK, Defendant Appellee.
No. 96-686.
Court of Appeal of Louisiana, Third Circuit.
December 26, 1996.
Rehearing Denied February 20, 1997.
Writ Denied May 1, 1997.
*813 Kenneth Gerard Miller, Lafayette, for Michelle Lyn Magos.
*814 Robert A. Lecky, Lafayette, for Jon A. Feerick.
Before YELVERTON, WOODARD and AMY, JJ.
WOODARD, Judge.
Michelle Magos brought suit against her dentist, Dr. Feerick, for malpractice, stemming from crown work that he performed in December of 1990. Michelle Magos sought damages for medical expenses, lost wages and pain and suffering. The jury returned a verdict in favor of Dr. Feerick, finding that he did not breach the standard of care in performing the crown work. Magos appealed. We reverse.

PROCEDURAL HISTORY
Magos filed a complaint with the Patient's Compensation Fund alleging that Dr. Feerick had breached the applicable standard of care when he performed crown work on her two upper front teeth. Pursuant to La.R.S. 40:1299.47, a medical review panel was convened consisting of a dentist chosen by the plaintiff, a dentist chosen by the defendant, and a third dentist chosen by the two original dentists. All three dentists were general practitioners. The Medical Review Panel reviewed the evidence available to it at the time and determined that it did not support a finding that Feerick's treatment of Magos failed to meet the requisite standard of care. Subsequently, on September 8, 1993, Magos filed a petition for damages in the Fifteenth Judicial District Court in Lafayette, alleging that Dr. Feerick committed malpractice in performing the crown work. On September 30, 1993, Feerick filed an answer denying that he performed the crown work in a manner which constituted a breach of the standard of care.
A jury trial was held on October 10-12, 1995 before Judge Patrick Michot in the Fifteenth Judicial District Court in Lafayette, Louisiana. The jury rendered a verdict in favor of Feerick, finding that he did not breach the standard of care. A judgment in favor of Feerick was signed on November 10, 1995, rejecting Magos' claims in their entirety. Thereafter, on December 6, 1995, Magos filed a motion for a JNOV or, in the alternative, for a new trial. A hearing was held on Magos' motion for a new trial on January 22, 1996. On that same day, Judge Michot denied the motion, thereby affirming the jury's verdict. Magos filed a devolutive appeal of the trial court's judgment on January 16, 1996.

FACTS
In November of 1990, Michelle Magos, who was then in her twenties, began undergoing treatment to repair a damaged tooth. Magos went to see her family dentist, Dr. Feerick, a practitioner of general dentistry with whom she has visited on a regular basis since she was nine years old. On November 16, 1990, Feerick prepared Magos' two front teeth for permanent crowns, and on November 19, 1990, he performed a root canal on those same teeth. He removed the temporary crowns and fitted and cemented the permanent crowns on December 5, 1990.
Shortly after the procedure, Magos began experiencing pain and discomfort in the gums above where the crowns were fitted. The pain and discomfort included swelling, bleeding and discoloration of the gums accompanied by a foul odor. On March 27, 1991, she returned to Feerick, complaining of the aforementioned symptoms. As was noted in his medical records, he advised her to massage her gums and rinse with Listerine. Although Magos' followed Feerick's suggestions, the pain and discomfort she was experiencing did not subside. In October 1991, she again returned to Feerick, complaining of the continued discoloration of her gums. He offered to redo the crowns at his expense if she so desired.
In November of 1991, Magos visited another dentist, Dr. Mark Welch, who discovered that she had open margins surrounding the permanent crown. An open margin occurs when the crown is not fitted properly onto the tooth, thereby leaving a gap between the tooth and the crown which causes substantial dental problems if left untreated. Dr. Welch concluded that the open margins were the cause of Magos' symptoms. Welch referred her to Dr. W. Orin Toce. On December 9, 1991, more than one year after her *815 permanent crowns were placed by Feerick, Toce examined Magos. Upon examination, he discovered severe inflammation and open margins, i.e. the crowns were not fitted properly onto the teeth. Magos returned to Toce's office on December 12, at which time he removed the permanent crowns and discovered that the gum tissue had grown into the open spaces between the tooth and the crown. He replaced the permanent crowns with temporary crowns to allow the gums to heal properly. When she returned to Toce's office on December 17, 1991, he referred her to Dr. Joseph L. Caldwell for root canal evaluation, suspecting that her roots had been perforated. A perforation occurs when an endodontic post, placed inside the tooth during a root canal procedure, punctures the tooth wall. Dr. Caldwell removed the posts inserted by Feerick when he initially performed the root canal and re-treated Magos. At that time, Dr. Caldwell also discovered that both front teeth had been perforated at the root under the gumline.
Despite the extensive effort to remedy Magos' dental problems, Toce was unable to place permanent crowns on her teeth. This was due to the perforations discovered by Caldwell and Toce's belief that the crown work performed by Feerick did not leave a sufficient amount of healthy tooth on which to place new crowns. Toce then referred Magos to Dr. Winston B. Diel in order for him to perform a "tooth lengthening" procedure to enable Toce to have sufficient healthy tooth in which to attach the new permanent crowns, and to properly repair the perforations. Despite Dr. Deil's efforts, he could not elongate the teeth to a sufficient length in order to accomplish their goals. He referred Magos to Dr. John M. Oubre, an orthodontist, in order to further elongate the teeth. The elongation procedure involved extensive orthodontic work during which Magos was required to wear braces for 1½ years. Finally, on April 28, 1995, more than four years after Feerick had inserted the permanent crowns, Toce was able to insert new permanent crowns on Magos' two front teeth.
ASSIGNMENTS OF ERROR
Magos asserts that the jury erred in:
(1) [F]inding that the defendant, Dr. Feerick, performed within the accepted standard of care in his treatment of the [p]laintiff[;]
(2) [f]ailing to find that the [d]efendants' [sic] breach in the standard of care owed to [p]laintiff caused her damages and in not awarding her the general and special damages proven.

LAW

MANIFEST ERROR
It is well settled that an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993). Based on this standard, the Louisiana Supreme Court has established a two-tier test for reversal on appellate review:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 882. Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). These principles are based upon the trial court's opportunity to evaluate live witnesses and upon the separate and distinct functions of the trial and appellate courts. Stobart, 617 So.2d 880.
Thus, an appellate court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must review the record in its entirety to determine whether the decision reached was manifestly erroneous. Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d *816 840 (La.1989); Law v. City of Eunice, 94-1312 (La.App. 3 Cir. 4/5/95); 653 So.2d 149.
Although the trial court is in a better position to evaluate and assess the credibility of witnesses, the overriding concern of the court of appeal is whether the fact finder's credibility determinations are reasonable. Where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness' story, a court of appeal may find manifest error or clear wrongness in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d 840.

MEDICAL REVIEW PANEL
The medical review panel, in this case, was comprised of three general practitioner dentists [hereinafter G.P.] and an attorney. The panel was selected as provided by La.R.S. 40:1299.47. The attorneys representing the parties agree on the attorney member. The attorney member acts in an advisory capacity and has no vote. Then, the plaintiff's attorney and the defendant's attorney each choose one G.P. to serve on the panel. The two G.P.s chosen by the attorneys then decide and agree upon the third G.P. to be selected for the panel. After reviewing all the evidence presented before it, the panel has the duty of expressing its expert opinion as to whether or not the evidence supports the conclusion that the defendant acted or failed to act within the appropriate standards of care. There is no burden of proof on either party. The statute does not specify whether the panel has to be unanimous in its opinion or whether a 2-1 vote is controlling.
As this court stated in Herpin v. Witherspoon, 95-370, p. 10 (La.App. 3 Cir. 11/2/95); 664 So.2d 515, 521:
The opinions of medical experts are necessary to the determination of the applicable standard of care and the inquiry as to whether that standard was breached. These opinions, while not controlling, are persuasive. Ultimately, the factfinder [sic] must evaluate conflicting expert opinions in relation to all the circumstances of the case. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir.1991) and the cases cited therein. When the experts' opinions are in conflict concerning compliance with the applicable standard of care, the trial court's determinations on this issue will be granted great deference. It is the sole province of the trier of fact to evaluate the credibility of such experts and their testimony. Charpentier, 606 So.2d 83.
In the case sub judice, however, the medical review panel did not have a complete record before it when it made its determination. Magos' treatment was ongoing at the time the panel rendered it decision. Dr. Joe Scales, the defense expert who participated in the medical review panel, testified at trial regarding the incomplete record. During his testimony at trial, the following colloquy took place:
Q. It's your testimony you hadn't seen Dr. Toce's chart when you met with the Medical Review Panel?
A. No, we had
Q. Some follow-up stuff?
A. Yeah. There was some printed material in there with the description and dates, but it wasn't the actual chart.
Q. Of course, the Medical Review Panel met before all of the work was done, so you probably didn't see a lot of the follow-up stuff.
A. That's correct.
Additionally, Dr. Caldwell was the periodontist who re-treated Magos' root canals and was the first doctor to observe the perforations. The medical review panel did not have information regarding his treatment and observations of Magos when they conducted their review.
Based on the facts of this case, the testimony concerning the medical review panel's decision is insufficient to accord it great weight. The medical review panel's decision was based on incomplete medical records and evidence regarding Magos' treatment. The medical review panel's decision, when admitted into evidence, serves as medical expert testimony. Therefore, like any other expert testimony, credibility of and weight accorded to the panel's opinion must be considered on *817 a case by case basis. In addition, the written reasons for the panel's decision were not admitted into evidence at the trial level, and, as such, the only available testimony concerning the panel's decision were brief comments by Dr. Joe William Scales, one of the general practitioner dentists who served on the panel. It is for these reasons that in this case the medical review panel's decision should not be accorded great weight.

STANDARD OF CARE IN DENTAL MALPRACTICE CASES
An unsuccessful course of treatment is not a per se indication of malpractice. Herpin, 664 So.2d 515. As we stated in Charpentier v. Lammico Insurance Co., 606 So.2d 83 (La.App. 3 Cir.1992), a dentist's professional judgment and conduct is to be evaluated in terms of reasonableness under then existing conditions, not in terms of results or in light of subsequent events. See also Herpin, 664 So.2d 515. Furthermore, a general practitioner dentist is not required to exercise the highest degree of care possible. Id. He must, however, exercise the degree of skill ordinarily employed by his peers under like circumstances, using reasonable care and his best judgment in performing the skill. Id. (citing Matthews v. La. State University Medical Center in Shreveport, 467 So.2d 1238 (La.App. 2 Cir.1985)).
In order to prove dental malpractice at trial, a plaintiff must satisfy, by a preponderance of the evidence, the three-prong test established in La.R.S. 9:2794:
A. In a malpractice action based on the negligence of ... a dentist licensed under R.S. 37:751 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... dentists, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by... dentists ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(Emphasis added.)
While the statute sets forth the requisite burden of proof that a plaintiff must meet in order to prove malpractice, the statute does not specify or set limits on the qualifications of expert witnesses who may be presented in an attempt by the plaintiff to satisfy their burden. McLean v. Hunter, 495 So.2d 1298 (La.1986). Pursuant to this Court's holding in Herpin and La.R.S. 9:2794(A)(1), a general dentist who is not a specialist is to be held to the standard of care exercised by other dentists licensed to practice in this state who are actively practicing in a similar community under similar circumstances. In other words, the "local standard" applies to general practitioners. Herpin, 664 So.2d 515. However, a specialist who has knowledge of the subject matter of the litigation may testify as to the degree of care that should be exercised by general practitioners within his same community. Koslowski v. Sanchez, 563 So.2d 937 (La. App. 1 Cir.1990), reversed on other grounds, 576 So.2d 470 (La.1991) (citing McLean, 495 So.2d 1298). As the Louisiana Supreme Court held in McLean:
[I]t is a specialist's knowledge of the requisite subject matter, rather than the specialty or sub-specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised by general practitioners. A particular specialist's knowledge of the subject matter on which he is to offer expert testimony should be determined on a case by case basis.

*818 Implicit support for our holding is provided by La.R.S. 9:2794(B), which provides that a party to a malpractice suit has "the right to subpoena any ... dentist ... for trial to establish the ... degree of care ordinarily exercised." A [specialist] is obviously no less a dentist because he engages in a specialty practice rather than a general dentistry practice.
495 So.2d at 1302 (emphasis supplied). Therefore, it is the specialist's knowledge of the subject matter of the litigation which determines whether he may testify regarding the degree of care that should be exercised by general practitioners. Koslowski, 563 So.2d 937. However, the specialist continues to be limited by community standards when evaluating the standard of care of general practitioners. Id.
Seven dentists testified as expert witnesses throughout the course of the trial. Four of the seven dentists actually treated Magos at some point during the last four years to prepare her teeth for the new permanent crowns. Those dentists were: Dr. Toce, a G.P.; Dr. Deil, a periodontist; Dr. Caldwell, an endodontist; and, Dr. Oubre, an orthodontist. All four were properly qualified and capable of testifying regarding the standard of care for general practitioners in the particular community in which Dr. Feerick practices, namely, Lafayette, Louisiana.
The fifth dentist, Dr. Scales, is a G.P. who practices in Lafayette. Dr. Scales had been selected by the defense to serve on the medical review panel and never personally examined Magos. As has already been established, Dr. Scales' opinion, given at the medical review panel proceedings, was based on incomplete information regarding Magos' condition and on-going treatment. Therefore, and as discussed above, great weight should not be given to the opinions he expressed in the panel's judgment.
The sixth dentist, Dr. Iley N. Harkins, is an orthodontist in Lafayette who had treated Magos prior to 1987. His testimony was introduced by deposition. Dr. Harkins had not seen Magos since 1987, approximately three years prior to Magos' visit with Dr. Feerick in November of 1990. Nor did Dr. Harkins see Magos after Feerick had placed the permanent crowns or at any time thereafter. Therefore, Dr. Harkins had little to add regarding Magos' condition just prior to or at any time following Feerick's treatment.
The seventh dentist, Dr. Noel F. Pilié, testified by video deposition. Dr. Pilié is a dentist who specializes in crown work in New Orleans. As a specialist, Dr. Pilié was fully qualified to testify regarding the standard of care that must be exercised by a G.P., however, his practice is limited to New Orleans. Therefore, Pilié should have been precluded from testifying due to the community standard limitation contained in the statute. Although his testimony should not have been admitted pursuant to La.R.S. 9:2794, as discussed above, the defense failed to object contemporaneously to the testimony of Dr. Pilié and thus waived its right to object on appeal to the admissibility of his testimony. See Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So.2d 443, 448 (La.1991). Therefore, Dr. Pilié's testimony can be considered and used to reinforce our ultimate findings and determinations.

ASSIGNMENTS OF ERROR NUMBERS 1 AND 2
In her assignments of error, Magos contends that the jury, and therefore, the trial court, erred in finding that Dr. Feerick performed within the accepted standard of care in treating her and in failing to award damages.

OPEN MARGINS
It is undisputed that in treating Magos, Feerick left open margins when he positioned the permanent crowns causing her pain, inflammation and discoloration of the gums. Dr. Scales, the defense expert who participated in the medical review panel, testified that gum tissue growing under crowns is indicative of open margins. Similarly, Dr. Deil testified that bleeding, inflammation and infection are symptoms associated with open margins. Feerick, himself, does not deny that he left open margins when he positioned the permanent crowns. However, the fact that Feerick left open margins in placing the permanent crowns is not an indication, in and *819 of itself, of a breach in the standard of care. Several of the experts who testified at trial agreed that, in the best of circumstances, a proper fit when cementing new permanent crowns is not always possible. Rather, the question of malpractice in the case sub judice arises in the context of how long the open margins went undetected by Feerick and how that may have exacerbated and perhaps, worsened, Magos' condition. In other words, did Feerick breach the standard of care in failing to discover and inform Magos of the open margins and the need to redo the crowns.
Magos contends that Dr. Feerick never informed her that she had open margins, or of the consequences associated with that condition; nor did he ever inform her of the need to redo the crowns. At trial, she testified regarding her first post-crown work visit to Feerick, where she complained of discoloration of the gums, soreness and bleeding.
Q. Did you voice those complaints to Dr. Feerick?
A. Yes, I did.
Q. What did he recommend?
A. He recommended that I massage the gum line because the gums needed tohe said that would help the gums, the tissue, the color of it, maybe that would help it come back. But that would be about it that I could do for the color, and he advised me to rinse with Listerine.
Q. Anything else?
A. No.
* * *
Q. At that time when you were in his office voicing those complaints.... It would have been March 27th, 1991, after you had the crowns.
A. Right.
Q. Did Dr. Feerick tell you there were open margins on the crowns?
A. No, he did not.
Q. Did Dr. Feerick tell you that the crowns would have to be replaced?
A. No, he did not.
Q. Did Dr. Feerick tell you that the crowns that he did didn't fit your teeth properly?
A. No, he did not.
Q. Did he explain to you that the reason you were having these problems was because the crowns he placed didn't fit you teeth properly?
A. No.
Q. Did he give you any indication that the work he had done to crown your teeth was responsible for the problems you were having?
A. No.
Later, Magos testified regarding the second post-crown visit to Dr. Feerick. At the October visit, she complained of a worsening of her previous symptoms and of a foul odor emanating from her mouth.
Q. In response to your complaints, what did Dr. Feerick recommend to you?
A. He continued to tell me I just needed to massage the gum line and to use Listerine. But at that visit Dr. Feerick did tell me if I didn't like the way the crowns looked, he would redo them.
Q. Now, at this visit did he tell you that the crowns that he had placed that you had in your mouth didn't fit your mouth right?
A. No.
Q. Did he tell you that the crowns he had placed had open margins and needed to be replaced?
A. No, he did not.
Q. Did he tell you that the crowns he had placed were the cause of the complaints that you were having?
A. No.
Q. Did he tell you the crowns he had placed were the cause of the darkness above the crowns?
A. No, he did not.
Q. Michelle, when you were in his office October of '91 making these complaints again, did Dr. Feerick do an examination of your crown work?
A. Dr. Feerick looked in my mouth with a mirror.

*820 Q. Did he put a probe or metal device in your mouth to check the crowns?
A. Not that I recall.
At trial, all of the experts testified that the proper way to examine a crown for open margins is to use an explorer or a probe (i.e., a metal device with a hook on the end of it) to determine if any gaps exist between tooth and crown margin. Dr. Feerick's records do not indicate that he performed such an examination in March or October of 1991, nor do his records indicate that he looked for or detected open margins. Furthermore, his records fully support Magos' testimony regarding the directions to massage and rinse with Listerine.
At trial, Feerick testified as follows:
Q. You had placed the permanent crowns, so they had been in her mouth since December 5th?
A. That's correct, more or less.
Q. Did you have any contact or communication with Michelle between December 5th and March 27th?
A. I have no indication of it.
Q. So approximately four months or just under four months later, on March 27th, she came in to see you. Was that a regular scheduled return visit?
A. No. She was coming in complaining about inflammation, darkness around the margin of her tooth. And at that time I recommended or suggested that I redo the crowns for her.
Q. At that time you said thatwell, your notes reflect that, in fact, she was complaining of darkness at the margins of the crowns.
A. Well, inflamed tissue is dark.
Q. That's that doesn't appear normal looking to most people; correct?
A. That's correct.
Q. And your recommendations were "patient massage the tissue," which is massage the gums?
A. That's correct. I mean, I wasn't satisfied with my crown, and that's when I told heror the crowns, and that's when I told her I would like to redo the crowns.
Q. Dr. Feerick, your record indicates "patient massage tissue or can redo crowns."
A. That's correct.
Q. Didn't you know on March 27th that you had open margins on these crowns?
A. I knew I had a problem with the crowns.
Q. Did you know you had open margins on the crowns?
A. I don't remember back to 1991.
Q. Dr. Feerick
A. I had to have a reason to put down in the chart that I would redo the crowns at my own expense, okay.
Q. Dr. Feerick, you didn't tell Michelle that her crowns needed to be redone March 27th, 1991 because she had open margins, did you?
A. Whywhy would I put in the chart on every crown patient that I'll redo the crowns? I had a reason. I did not document it any further than that.
Q. Dr. Feerick, did you understand my question?
A. I certainly did.
Q. Okay. I'm going to ask you to answer my question. You didn't tell Michelle that she had open margins on March 27th, 1991?
A. I told her I was unsatisfied with the crowns.
Q. You didn't tell Michelle that she needed to have the crowns redone, that they couldn't stay in her mouth like that, did you?
A. I said I'd redo the crowns. I mean, I didn't put a gun to her head.
Q. Dr. Feerick, following March 27th 1991 you saw her again October 1991, according to your record; correct?
A. Correct.
* * *
Q. Now, when you saw her October 1st, 1991, there's no record here that you recommended or even offered to redo her crowns again at this point, did you?

*821 A. It's not indicated in the chart.
Q. Do you feel like she was doing pretty good October 1st, 1991?
A. Not really. If you read the chart, it says "generalized slight gingivitis," which means inflammation of all gum tissue.
Q. You didn't check the crowns for open margins when you saw her October 1st, '91, did you?
A. I do not have documented that I did.
Q. You didn't check, in fact, to see whether tissue was growing behind or between the crowns and the tooth preparations October 1st, 1991, did you?
A. No. I just said I didn't.
As the record reflects, the experts testified that inflammation of the gums is a symptom of open margins. The improper fit of the crowns was subsequently discovered by Dr. Welch, who examined Magos with an explorer when she accompanied her mother on a routine visit. It was only then that she was informed she would need new crowns due to the open margins on the existing permanent crowns and in order for her gums to heal properly.
Dr. Toce, who subsequently fitted Magos with her new permanent crowns, was questioned regarding the appropriate standard of care for a dentist in performing crown work.
Q. In your opinion, Dr. Toce, in your professional opinion, is it below the standard of care to install crowns that have open margins and not notice that?
A. That's a tough question, because you can check and you can still miss areas. I mean, everybody does. You're never 100 percent sure.
Q. Dr. Toce, if you install a crown and you have a patient come back to you within three and a half months complaining of bleeding, complaining of throbbing, complaining of problems with darkening gums above the crowns that you installed, at that time would it be below the standard of care not to evaluate and determine whether you had open margins?
A. At that point in time, yes.
Q. Would it be below the standard of care at that point in time not to advise the patient that the crowns need to be removed and the margins revised?
A. Yes.
* * *
Q. [W]hen you saw her, could you tell from what you saw that Michelle had open margins in her crown work that had been there for a while?
A. Yes.
Additionally, Dr. Toce testified that the crown preparation work done by Feerick was substandard because there were no definite margins to fit the crown against in the first place, and that it was the failure to establish definite margins that caused the margins to remain open and allow for tissue growth into that area. Dr. Caldwell was in "100 percent" agreement with Dr. Toce's findings. Even Dr. Scales, the defense expert who participated in the medical review panel, agreed that it is below the standard of care not to inform the patient of the need to redo the crowns.
Q. Now, Dr. Scales, when you were asked about the obligation or responsibility of a dentist who had an open margin, it would be the dentist's responsibility to redo the crown. Did I correctly characterize that?
A. That's how I handle it, yes.
Q. And then when pushed further on the second question and asked about your responsibility or the dentist's responsibility to inform the patient, you said that you let the patient know that you weren't satisfied with the result that you had and then you would want to do it over.
A. That's correct.
Q. In other words, you would advise the patient of the condition, the open margin condition, or at least the fact that the crowns weren't fitting right; correct?
A. Maybe not specifically. I feel like if I'm going to tell the patient that I'm dissatisfied with the result and that I *822 feel like it needs to be redone, sometimes that's all I'll do.
Q. But with that, you convey to the patient that it does need to be redone.
A. Yes, sir.
Q. There's no question when you finish that the patient has received the information that the crowns need to be redone; correct?
A. That's correct.
Q. And that would be what would be required of a dentist in order to meet a minimum standard or something that's accepted in the profession; correct?
A. I would think so.
Under these circumstances, Feerick's substandard crown work, including his failure to detect and inform the patient of the open margins, constituted a breach in the standard of care. This case is similar to Baker v. Scott, 447 So.2d 529, 531-32 (La. App. 2 Cir.1984), in which the court stated:
[The patient] testified that she has had difficulty and has experienced much pain since shortly after [the dentist] performed his work. She was not able to obtain relief from [his] office.... She testified that she began to realize in September or October of 1979 that there was something wrong with the work done by [the dentist]. . . .
[The expert testified] and the Court is of the opinion that the evidence clearly establishes that [the dentist's] work was substandard. If [the dentist] had properly performed his work the condition of [the patient's] mouth after that work would have been such that her teeth would be free from decay, ... the crown ... would fit properly and her gums would be healthy. In fact, her teeth had much decay,... open margins, ill fitting and loose bridgework, and she had a generally unhealthy mouth....
[A]nother expert witness, also examined [the patient] after the work done by [the dentist]. He said that her mouth was in a mess. [The dentist's] work was unacceptable, and the only way to correct it was to remove what was done and restore the crowns.... He said that [the patient's] problems were due to the manner in which [the dentist] performed the work....
* * *
The evidence establishes that the work performed by [the dentist] was below the standard of care ordinarily exercised by dentists in the area. The work he did for [the patient] was not done correctly and was of no benefit to her....
* * *
[T]he evidence shows that the condition of [the patient's] mouth deteriorated because of the work done by [the dentist].
Regarding the open margins in the case sub judice, Drs. Toce, Caldwell, and Scales, expert witnesses testifying regarding the standard of care when performing crown work in Lafayette, testified that the crown work did not measure up to the prevailing standards of dental care in the area. Furthermore, at the time the open margins were finally detected, the crown work was not correctable. Several dentists testified about the condition of Magos' mouth and the necessity of the work that was performed. As such, Magos suffered substantial pain and discomfort, as well as long, protracted treatment which she would not have incurred had Dr. Feerick properly performed or corrected the crown work.
Magos proved dental malpractice by establishing the following, through various experts: the standard of care ordinarily exercised by dentists in the community; that Feerick failed to use reasonable care or adhere to that standard; and that, as a result, she suffered injuries that would otherwise not have been incurred. Specifically, Dr. Feerick failed to use reasonable care or his best judgment when he neglected to detect and properly inform the patient of the existence of open margins so that she could timely take appropriate action. It appears from his own testimony, that Dr. Feerick played a semantics game with this patient by simply telling her that if she was not satisfied, he would redo the crowns, as opposed to telling her that it was in her best interest to have the crowns redone.
*823 Based on all the evidence presented, this court is of the opinion that a reasonable factual basis does not exist for the jury's finding that Dr. Feerick did not breach the standard of care. Thus, such a finding is clearly wrong. We find that the dentist did breach the standard of care in performing the crown work, thus subjecting Magos to substantial dental treatment which she would not otherwise have had to endure. Pursuant to La.R.S. 9:2794, we conclude that Magos proved dental malpractice, due to Dr. Feerick's failure to detect and advise Magos of the existence of the open margins, and that she suffered both emotionally and physically because of Dr. Feerick's breach of the standard of care.

PERFORATIONS
The perforations were first noticed by Dr. Toce during Magos' second visit to his office on December 12, 1991. Dr. Toce opined that the endodontic posts, which Feerick had inserted into the root canal openings, caused the perforations to the front of the tooth.
There is no doubt that Feerick was responsible for the perforations. Drs. Welch and Toce were the only dentists to see Magos since the time that Feerick did her root canal on those teeth. Neither Drs. Welch nor Toce did any root canal work. It was the reason, in fact, that Toce referred Magos to Dr. Caldwell; namely, to remove the existing endodontic posts and to evaluate her root canal, or endodontic, work. Dr. Caldwell surgically treated the perforations. If the perforations had been left untreated, Magos would have experienced recurrent tooth and gum decay and possible loss of her teeth. Dr. Caldwell removed the existing posts and prepared Magos' teeth so that Toce could place new endodontic posts. Dr. Caldwell testified that he saw the perforations when he removed the posts that had been placed by Dr. Feerick and noted that the perforations were located exactly at the point where the posts ended.
Causing the tooth to be perforated during a root canal is not malpractice per se. Experts testified that perforations are a risk associated with root canal work. The question of a breach on the standard of care arises when a dentist detects the perforations and does nothing to address the problem. In this case although Feerick caused the teeth to be perforated, there is no evidence that he ever detected the perforation. Therefore, his actions of causing the perforations and not repairing them do not constitute a breach in the standard of care.

DAMAGES
During Magos' initial examination with Dr. Toce on December 9, 1991, he found that the tissue, or gum, around the crown placed by Feerick was very inflamed and bleeding and that the crowns did not fit properly. When Magos returned to his office on December 12th, he removed the crowns and found the gum tissue growing underneath the crowns. He took steps to allow the gums to heal in order to be able to place permanent crowns on Magos' teeth. However, he discovered that he did not have enough healthy tooth on which to attach permanent crowns, because the margins were too far up under the gums. After contemplating several options, the only viable one was to pull the teeth down orthodontically so that a proper attachment could be made. In order to accomplish this procedure, Magos was referred to Dr. Oubre an orthodontist, who fitted her with braces. The elongation procedure lasted one and one-half years after which the permanent crowns were finally able to be placed properly. All of the dentists who treated Magos agreed with Toce's method of treatment and repair. At trial, Dr. Deil, the periodontist who first attempted to elongate Magos' teeth, testified as follows:
Q. Dr. Deal [sic], before you go on, let me bring you back and focus initially on the first time she came in to see you. You testified that Dr. Toce referred her and that he didn't feel like the crown preparation work, that the teeth were suitable for preparing for crowns. I believe that was your testimony; correct?
A. Right.
Q. When you saw her and you examined her, did you agree with that conclusion?
A. Yes....
* * *

*824 Q. So when Dr. Toce refused to cement a permanent crown in without extruding the tooth, you agreed with that?
A. 100 percent. You wouldn't have cemented it on my tooth like that.
* * *
Q. So because the problem was there of establishing a proper margin on number 8, the extrusion was necessary, the orthodontic work was necessary, in your opinion?
A. Correct.
Dr. Toce testified that one of the reasons that the orthodontics were necessary was to pull the teeth down far enough to get the perforation below the gum line so that it could be repaired. Dr. Deil testified that the perforations could not be treated by a crown lengthening procedure and that it was necessary to extrude the teeth, in order for the perforations to be treated and for the permanent crowns to be placed. Dr. Deil and Dr. Toce agreed that Dr. Oubre should perform the extrusion of the two front teeth. At trial, Dr. Deil was questioned about that procedure as follows:
Q. Do you agree that the final crown work for Michelle, considering the things you know about her case, could not be done, and properly done, until after her teeth were extruded and that solid tooth made available?
A. I don't think it could have been properly done unless she underwent what she underwent because the perforation would have continued to wash out. She would have continued to have the same problem. Her real option was to do what we did or pull them, in my opinion.
Later, on cross-examination, Dr. Deil stated that it was because of the existence of the perforations that the orthodontics were necessary.
Furthermore, Dr. Oubre, the orthodontist who performed the elongation procedure, testified that he agreed with the necessity to extrude the teeth to allow for a solid margin on which the permanent crowns could be placed and to achieve an acceptable aesthetic result. Also, Dr. Oubre added the following regarding the extent of the orthodontic work he needed to perform:
Q. [A]s an orthodontist, when you get a client or patient such as Michelle with a special problem to address, two front teeth, I think earlier you said that you, as an orthodontist, approach the teeth as a group, working together with all of them.
A. Right.
Q. In other words, you don't do something with two teeth without being concerned about the impact that might have on the rest of the mouth.
A. Correct.
* * *
Q. So for Michelle, in order to address pulling those two front teeth down, you needed to do the orthodontic work that you did?
A. Correct.
There is sufficient evidence to find liability on the part of Dr. Feerick for these damages, despite the fact that his actions in causing the perforations do not, in and of themselves constitute malpractice. Failure to recognize and remedy the margin problem did constitute malpractice. The need for an adequate margin alone, which was a result of malpractice, would have necessitated all of the dental work; even though the perforations were not caused by malpractice. Our finding that the orthodontics were necessary to provide an adequate margin to apply the permanent crowns would support this view. Therefore, it follows that Dr. Feerick is liable for the costs of repairing all the damage, but only because it was inextricably part of the repair occasioned by his malpractice.
Magos suffered pain and discomfort for many years following Dr. Feerick's substandard crown work. Although she complained to him regarding discoloration, inflammation, bleeding, and a foul odor on two occasions following his crown work, it was not until one year later that her problems were addressed by Dr. Toce. Second, it took approximately four years for Magos' teeth to be ready for fitting permanent crowns on them. During this period, this young lady in her 20s suffered pain and embarrassment due especially to the unavoidable view of her two front teeth. The gum tissue had to be surgically repaired, the root canals redone, the perforations had to *825 be repaired, and the teeth elongated. Although temporary crowns were placed, they are not like permanent crowns in terms of aesthetic appearance. In addition, the discoloration of the gum line, the black line that appeared above her front teeth, will be a permanent condition. Third, several times during the course of treatment, Magos received painful injections to her gums in order to facilitate the dental work. Fourth, Magos' eating habits had to be altered as she could no longer enjoy spicy foods, and was forced to eat bland foods so as not to irritate the gums. Lastly, Magos altered the way she presented herself to others in order to be able to hide her teeth throughout the time she was being treated. Based on the foregoing, it is not only apparent that Magos experienced substantial pain and discomfort, but that she also suffered considerable disruption of her life due to the length of time required for the repairs.

CONCLUSION
Accordingly, the judgment of the trial court is reversed. Judgment is rendered in favor of the plaintiff in the sum of $ 37,136.00, consisting of $6,696.00 for medical expenses, $440.00 for lost wages, and $30,000.00 for pain and suffering, against Feerick, plus interest and all costs here and below.
REVERSED AND RENDERED.